ACCEPTED
15-25-00096-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
9/15/2025 4:10 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00096-CV**

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
9/15/2025 4:10:18 PM
CHRISTOPHER A. PRINE
Clerk

CITY OF COLLEGE STATION,

*Appellant*,

*v.*

PUBLIC UTILITY COMMISSION OF TEXAS,

*Appellee.*

On Appeal from the 200th District Court of Travis County, Texas
The Hon. Daniella DeSeta Lyttle, Presiding Judge, Cause No. D-1-GN-24-005680

# RESPONSE BRIEF OF APPELLEE
# PUBLIC UTILITY COMMISSION OF TEXAS

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection
Division

September 15, 2025

JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012 | Fax: (512) 320-0911

ATTORNEYS FOR APPELLEE
PUBLIC UTILITY COMMISSION OF
TEXAS

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES...................................................................... iv

GLOSSARY OF ACRONYMS AND TECHNICAL TERMS............................. vii

STATEMENT REGARDING ORAL ARGUMENT ........................................ viii

STATEMENT REGARDING CITATIONS ................................................ viii

ISSUES PRESENTED.......................................................................... ix

INTRODUCTION .................................................................................1

STATEMENT OF FACTS ......................................................................3

    A.    Legal background and regulatory framework ......................................3

    B.    College Station's first comprehensive transmission rate application and three interim rate applications .............................6

    C.    College Station's 2021 comprehensive rate application and the Commission's reconciliation of the three interim rate orders ..........................................................................9

STANDARD OF REVIEW .....................................................................13

SUMMARY OF THE ARGUMENT ..........................................................16

ARGUMENT .....................................................................................18

    I.    The Commission correctly concluded that College Station improperly added GFTs in it interim rates because they were not first approved in its comprehensive rates. ..........................................................18

        A.    The GFTs were not a change in invested capital or a change in taxes associated with changes in invested capital...........................................................19

        B.    The Commission's practice and precedent is to update GFTs in an interim proceeding in

proportion to the approved amount in the utility's comprehensive transmission revenue requirement. ..................................................24

    C.    Interim applications serve a narrow purpose and are not designed for utilities to add expenses that were not approved, or that they forgot to request, in their comprehensive rates. ..................................................28

    D.    The Commission did not adopt an ad hoc rule to reach its conclusion. ..................................................30

II.    The Commission correctly applied the reconciliation provision in its rule to order a refund of the full amount of over-recovery. ..................................................33

    A.    The rule provides that any amount of over-recovery shall be refunded. ..................................................34

    B.    The Commission correctly concluded that the circumstances of this case did not constitute good cause to excuse the full-refund requirement. ..................................................36

        i.    The Commission's conclusion was supported by substantial evidence. ..................................................37

        ii.    The Commission's conclusion was not an abuse of discretion. ..................................................40

        iii.    The Commission properly rejected the ALJs' recommendation. ..................................................44

PRAYER ..................................................46

CERTIFICATE OF COMPLIANCE ..................................................48

CERTIFICATE OF SERVICE ..................................................49

INDEX TO APPENDIX ..................................................50

# INDEX OF AUTHORITIES

**Cases**                                                                          **Page(s)**

*Cent. Power & Light Co. v. Pub. Util. Comm'n of Tex.*,
36 S.W.3d 547 (Tex. App.—Austin 2000, pet. denied) .....................................39

*Cities for Fair Util. Rates v. Pub. Util. Comm'n of Tex.*,
924 S.W.2d 933 (Tex. 1996) ..............................................................................20

*City of El Paso v. Pub. Util. Comm'n of Tex.*,
883 S.W.2d 179 (Tex. 1994) ..............................................................................15

*City of Frisco v. Tex. Water Rights Comm'n*,
579 S.W.2d 66 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ..............................38

*Dyer v. Tex. Comm'n on Env't Quality*,
646 S.W.3d 498 (Tex. 2022) ..............................................................................14

*Heritage on San Gabriel Homeowners Ass'n v. Tex. Comm'n on Env't Quality*,
393 S.W.3d 417 (Tex. App.—Austin 2012, pet. denied) ...................................16

*Lone Star Gas Co. v. State*,
153 S.W.2d 681 (Tex. 1941) ..............................................................................20

*Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*,
901 S.W.2d 401 (Tex. 1995) ..............................................................................19

*Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*,
620 S.W.3d 418 (Tex. 2021) ...................................................................... 14, 15

*Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*,
153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied) ...................................19

*Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*,
652 S.W.2d 358 (Tex. 1983) ...................................................................... 19, 30

*Sw. Pub. Serv. Co. v. Pub. Util. Comm'n of Tex.*,
962 S.W.2d 207 (Tex. App—Austin 1998, pet. denied) ............................ 44, 45

*Tex. Ass'n of Long Distance Tel. Cos. (Texaltel) v. Pub. Util.*
*Comm'n of Tex.*,
798 S.W.2d 875 (Tex. App.—Austin 1990, writ denied)...................................31

*Tex. Comm'n on Env't Quality v. Friends of Dry Comal Creek*,
669 S.W.3d 506 (Tex. App.—Austin 2023, pet. denied) ............................ 15, 16

*Tex. Comm'n on Env't Quality v. Maverick Cnty.*,
642 S.W.3d 537 (Tex. 2022) .........................................................................14

*Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*,
665 S.W.2d 446 (Tex. 1984) ..................................................................... 16, 40

*Tex. State Bd. of Pharmacy v. Witcher*,
447 S.W.3d 520 (Tex. App.—Austin 2014, pet. denied) ..................................31

*Vance v. My Apartment Steak House of San Antonio, Inc.*,
677 S.W.2d 480 (Tex. 1984) .........................................................................46

*W. Tex. Utils. Co. v. Off. of Pub. Util. Counsel*,
896 S.W.2d 261 (Tex. App.—Austin 1995, no writ.) ................................. 31, 32

**Statutes**

Tex. Gov't Code
  § 1502.059...........................................................................................4
  § 2001.058..........................................................................................45
  § 2001.174..........................................................................................14
  § 2001.174(2).......................................................................................14
  § 2001.174(2)(F)...................................................................................15
  § 2001.175(e)........................................................................................14
  § 2003.049(g)(1)(B)...............................................................................44

Tex. Util. Code
  § 11.002(a) ...................................................................................... 3, 43
  § 12.001...............................................................................................38
  § 12.051...............................................................................................38
  § 15.001...............................................................................................13
  § 35.004(c) ...................................................................................... 3, 29
  § 35.004(d)............................................................................................3
  § 39.151................................................................................................3

**Rules**

16 Tex. Admin. Code

§ 22.5(b)................................................................................................36

§ 22.35(a) .............................................................................................6

§ 25.192.................................................................................................2

§ 25.192(c) ...........................................................................................4

§ 25.192(h) ...........................................................................................4

§ 25.192(h)(1) ......................................................... 5, 16, 18, 19, 20, 25, 35

§ 25.192(h)(2) ......................................................... 5, 6, 17, 33, 34, 35, 40

§ 25.192(h)(4)(C) ..................................................................................6

**Other Authorities**

Pub. Util. Comm'n of Tex., *Rulemaking Proceeding to Amend SUBST. R. § 25.192(g) Related to Transmission Service Rates*, Project No. 37519, Order Adopting Amendment to § 25.192 as Approved at the July 30, 2010 Open Meeting (Aug. 4, 2010), https://interchange.puc.texas.gov/search/documents/?controlNumber=37519&itemNumber=39 .........................................................................42

# GLOSSARY OF ACRONYMS AND TECHNICAL TERMS

| Term | Meaning |
| --- | --- |
| ALJs | Administrative Law Judges |
| AR | Administrative Record |
| College Station | The City of College Station |
| Commission | Public Utility Commission of Texas |
| ERCOT | Electric Reliability Council of Texas |
| GFT | General Fund Transfer |
| PFD | Proposal for Decision |
| PURA | Public Utility Regulatory Act |
| SOAH | State Office of Administrative Hearings |
| TCOS | Transmission Cost of Service |
| TCOS Rule | Commission Rule 25.192 |

## STATEMENT REGARDING ORAL ARGUMENT

The Commission respectfully requests oral argument. This case involves the complex statutory and regulatory scheme regarding wholesale transmission rates and the Commission's reconciliation process for interim transmission rates. Oral argument will provide an opportunity for the Commission to answer questions regarding its transmission rate application procedures to aid in the Court's decision-making process.

## STATEMENT REGARDING CITATIONS

In this brief, citations to the Clerk's Record will be in the following form: CR at [Page number]. Citations to the Reporter's Record will be in the following form: RR at [Page number]. Citations to the Administrative Record, which was admitted into evidence in the Reporter's Record, will be in the following form: RR, AR [Item number] at [Page number]. All cited page numbers refer to the document's original page numbers when practical. Otherwise, the PDF page number will be cited in the following form: RR, AR [Item number] at PDF [Page number].

# ISSUES PRESENTED

1. Does substantial evidence, and the transmission cost of service rule, support the Commission's conclusion that College Station's General Fund Transfer ("GFT") was not a "change in invested capital" and therefore not permitted to be recovered via an interim update of transmission rates?

2. Did the Commission abuse its discretion by not finding good cause to excuse College Station from the requirement to refund the full amount, plus carrying charges, of the over-recovered expenses?

## INTRODUCTION

The Public Utility Commission of Texas ("Commission") regulates the wholesale transmission rates that every transmission provider in the Electric Reliability Council of Texas ("ERCOT") grid charges. By statute and rule, those rates must be just, reasonable, and grounded in the utility's actual Transmission Cost of Service ("TCOS"). To that end, the Commission administers two complementary rate processes. A utility first establishes its baseline rates in a comprehensive rate case, where the Commission thoroughly reviews its finances and sets both its revenue requirement and rate of return. Between comprehensive cases, a utility may file interim applications to update its rates—but only to reflect changes in its "invested capital," such as the addition or retirement of transmission facilities and changes in taxes and depreciation associated with changes in invested capital. Interim rates are expedited, temporary measures, and by rule they are always subject to reconciliation in the next comprehensive rate case.

The City of College Station ("College Station"), a municipally owned utility, filed three interim applications over a 15-year span. Each time it included a General Fund Transfer ("GFT")—money it moved from its utility to the city's coffers—under the other associated taxes category. But GFTs are not changes in invested capital; they are revenue transfers, and College Station expressly agreed it would not recover any GFT in its initial comprehensive rate case. By including them, College

1

Station nearly doubled its transmission revenue requirement, inflated its effective rate of return far above the 6.71% approved in its last comprehensive case, and shifted tens of millions of dollars in added costs onto ERCOT consumers.

When College Station finally returned for a comprehensive rate case in 2021, the Commission had its first opportunity to reconcile these interim rates. Applying Commission Rule 25.192 ("TCOS Rule"), the Commission concluded that College Station improperly included GFTs in interim rates that the Commission did not first approve in its comprehensive rates and required College Station to refund approximately $26 million—the amount of over-recovery, net of under-recovery, over the same 15-year period that the charges were collected.

This case therefore presents a straightforward question: did the Commission act within its authority and on the basis of substantial evidence when it determined that (1) GFTs are not "changes in invested capital" that may be added through interim filings, and (2) the governing rule required College Station to refund the full amount of its over-recovery? The Commission's order reflects both the plain language of its rule and its statutory duty to ensure just and reasonable rates. The Commission did not disaffirm any prior orders, which all stated that the interim rates were subject to later review and reconciliation. However, this was an issue of first impression for the Commission and the first opportunity to apply the TCOS Rule to these circumstances in a contested case hearing.

2

# STATEMENT OF FACTS

## A. Legal background and regulatory framework

The Texas Legislature enacted the Public Utility Regulatory Act ("PURA") in 1975 to establish a comprehensive regulatory scheme over the electric industry. PURA created the Commission and charged it with the general power to regulate and supervise the utilities within its jurisdiction for the purpose of ensuring that electricity rates were just and reasonable. Tex. Util. Code § 11.002(a). The Commission designated ERCOT as the independent grid operator to oversee the intrastate electric grid. Tex. Util. Code § 39.151. In carrying out its statutory duty to ensure that rates are just and reasonable, the Commission sets transmission rates for all utilities that interconnect to the ERCOT transmission system. Transmission rates are paid by all utilities that use the transmission system, and these costs are passed on to all electric consumers in the ERCOT region.

The Commission sets wholesale transmission rates for a wholesale transmission provider based on its TCOS. Tex. Util. Code § 35.004(d). This allows transmission providers to recover both the costs they incur in the management and maintenance of their transmission systems and an appropriate return on investment. *Id*. Utilities are only permitted to recover the reasonable and necessary costs of providing transmission service by including those costs in their wholesale transmission rates. Tex. Util. Code § 35.004(c). The Commission's rules establish

3

the procedures setting transmission rates. There are two different types of transmission rate applications a utility can file with the Commission: (1) a comprehensive rate application, and (2) an interim rate application. 16 Tex. Admin. Code § 25.192(c), (h).

Comprehensive rate applications are thorough reviews of the applicant's financial information in which the Commission sets the utility's rate structure and rate of return. The Commission calculates transmission rates based on the transmission provider's annual transmission revenue requirement. The categories of expenses that a utility can include in its revenue requirement include: (1) transmission operation and maintenance expenses plus depreciation; (2) federal income tax and other associated taxes; and (3) the Commission-allowed rate of return. 16 Tex. Admin. Code § 25.192(c).

Under the TCOS Rule, municipally owned utilities are permitted to include GFTs in their transmission revenue requirement under some circumstances. GFTs are the transfer of revenue from a municipal utility to the city's general fund for general or special purposes. Tex. Gov't Code § 1502.059. GFTs are referred to by different names depending on how the city ordinance or policy that created it is designed. RR, AR Item 30 at 4:22-5:2. Under these policies, municipalities can include GFTs in the retail rates they charge their own residents and therefore use GFTs as a mechanism for transferring utility revenues to the city's coffers for general

4

use. But to determine whether a municipally owned utility can recover GFTs through the transmission rates it charges ERCOT ratepayers, the Commission evaluates the city's stated purpose of the transfer and the reasonableness of the proposed transfer in light of that purpose. *Id*. at 5:14-18. Because every city has a unique GFT, there is no express category in the TCOS Rule for including them in transmission rates. If the Commission allows the GFT to be included in the utility's transmission revenue requirement, it is commonly categorized as taxes other than income taxes or as a component of its rate of return. *Id*. at 5:18-21.

A utility can file interim applications between comprehensive applications to update transmission rates on an interim basis to reflect changes in its invested capital. 16 Tex. Admin. Code § 25.192(h)(1). Interim rates reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the Commission-approved rate of return on such facilities as well as changes in loads. *Id*. The Commission-approved rate of return that is applied to interim rates is the rate of return that the utility receives in its comprehensive rate case. By their nature, interim rates are temporary and are subject to reconciliation during the utility's next comprehensive rate application. 16 Tex. Admin. Code § 25.192(h)(2). During reconciliation, the Commission reviews the additional expenses included in the utility's interim filings to determine if they were reasonable and necessary. *Id*. The utility is required to refund any amount, with

carrying costs, that the Commission determines were unreasonable or unnecessary. *Id.*

The interim rate application process is designed to be an expedited review of the application and does not contain the stringent analysis of a comprehensive rate case. Interim rate applications are conducted following the Commission's informal disposition procedures. 16 Tex. Admin. Code § 25.192(h)(4)(C). Under this expedited process, the presiding officer of the Commission shall issue a notice of approval within 60 days from the application being deemed materially sufficient. *Id.* Under the Commission's informal disposition process, the Commission approves applications without an evidentiary hearing. 16 Tex. Admin. Code § 22.35(a).

**B.     College Station's first comprehensive transmission rate application and three interim rate applications**

College Station filed its first comprehensive rate application, Docket No. 15762, to set its wholesale transmission rates in 1996. In that application, College Station included a GFT totaling $1,434,060 categorized as taxes other than income taxes. RR, AR Item 38 at 16:14-17:4. However, College Station's transmission rate application was resolved by a settlement agreement that allocated the full amount of the GFT to its distribution function. RR, AR Item 30 at 16:3-5. Under the terms of the settlement agreement, College Station's revenue requirement did not include any

"payments in lieu of taxes."[1] *Id*. at 15:16-18. Thus, College Station could not recover any GFT from its transmission rates. In other words, College Station would recover the full amount of GFTs through the retail rates that it charged its residents. In 1997, the Commission issued a final order adopting the settlement agreement and set College Station's rate of return at 6.71%, its total transmission revenue requirement at $495,211, and its taxes other than income taxes at $0. *Id*. at PDF 85.

College Station filed its first interim rate application with the Commission in 2007 (Docket No. 34230). While processing the application, Commission staff reminded College Station to also update its "payment-in-lieu of taxes." RR, AR Item 36 at PDF 17. College Station informed Commission staff that they did not include this expense in their initial comprehensive rates and asked how to proceed. *Id*. at PDF 23. Commission staff informed College Station that they could include this increase in the interim rate application and the Commission would determine if it was allowed. *Id*. at PDF 17-18. College Station then included a GFT of $833,330 categorized as taxes other than income taxes. *Id*. at PDF 25. Commission staff recommended that the Commission approve the interim rate application and specifically noted the approval was conditional on "the updated transmission rate and underlying facility additions being subject to a comprehensive analysis and

---

[1] Payment-in-lieu of taxes represent payments of ad valorem taxes that a municipally owned utility would be required to pay a municipality if it were an investor-owned utility. RR, AR Item 30 at 12:5-7.

reconciliation at the next complete review of [College Station]'s transmission cost of service." *Id*. at PDF 56. The order approving College Station's interim rates provided "[t]he updated rate is subject to reconciliation at the next complete review" and "[a]ny over-recovery of costs, as a result of update, is subject to refund." *Id*. at PDF 57.

Shortly after its first interim update, College Station filed its second interim rate application with the Commission in 2008 (Docket No. 35837). College Station updated the taxes-other-than-income-taxes category to increase its GFT to $1,228,955, RR, AR Item 30 at PDF 82, and reached out to Commission staff to inquire as to whether their GFT calculation was correct. RR, AR Item 36 at PDF 64. Commission staff replied that College Station could "go ahead with your inclination" but to "fully explain the issue in any testimony you include with your filing." *Id*. at PDF 59. Commission staff's approval recommendation memos provided that their review of the interim application was "limited in scope and not the final accounting" and that the "administrative review is not intended to determine the reasonableness of any interim costs." *Id*. at PDF 79, 81. Commission staff again recommended approval subject to review and reconciliation at the next comprehensive rate review. *Id*. at PDF 71. The order approving College Station's interim rates again provided that the updated rate was subject to review and reconciliation. *Id*. at PDF 72.

8

College Station filed its third and final of the interim rate applications at issue in 2017 (Docket No. 46847). The interim rate application again updated the taxes-other-than-income-taxes category to increase its GFT to $1,476,306. RR, AR Item 30 at PDF 82. College Station did not reach out to Commission staff regarding the GFT inclusion for this interim update. Commission staff again recommended approval subject to review and reconciliation. RR, AR Item 36 at PDF 75-76. The order approving the interim update again provided that the updated rate was subject to review and reconciliation. *Id*. at PDF 77-78.

## C. College Station's 2021 comprehensive rate application and the Commission's reconciliation of the three interim rate orders

College Station filed this comprehensive rate application on November 3, 2021. In its application, College Station included a 9% GFT as a component of its rate of return that it characterized as an in-lieu-of franchise fee. RR, AR Item 2 at PDF 45. On April 18, 2022, the Commission referred the case to the State Office of Administrative Hearings ("SOAH"). RR, AR Item 19.

In reviewing the requested rates for reasonableness, the Commission staff expert witness, Ruth Stark, found that College Station did not have an approved GFT included in the taxes-other-than-income-taxes category in its last comprehensive rates. RR, AR Item 30 at 8:9-11. Ms. Stark then reviewed College Station's three interim rate applications and found that it included GFTs in its interim revenue requirements. *Id*. at 8:11-15. Because this is the next comprehensive rate proceeding

9

following College Station's first comprehensive rate case, College Station's interim rates were subject to reconciliation and Ms. Stark performed a thorough review to determine the effect of including GFTs in its interim rates. *Id*. at 8:15-19.

In comparing College Station's interim rate applications with its comprehensive rate application, Ms. Stark found that the inclusion of GFTs in its interim revenue requirements resulted in a much higher effective rate of return than its Commission-approved rate of return of 6.71%. *Id*. at 14:1-3. In its 2007 case, the $833,330 additional compensation to the city through the GFT together with its $564,002 approved return on rate base totaled $1,397,332. *Id*. at PDF 82. College Station's total rate base in the interim proceeding was $8,405,393; therefore, the total return gave College Station an effective rate of return of 16.62%. *Id*. Similarly, the inclusion of GFTs in its interim rates in 2008 brought its effective rate of return to 16.82%, and in 2017 to 13.34%. *Id*.

Ms. Stark noted that under the terms of the 1997 settlement agreement adopted in its first comprehensive rate case, College Station's transmission rates did not include payments-in-lieu of taxes, and College Station had agreed to allocate 100% of its GFT to its distribution function. RR, AR Item 30 at 15:16-16:5. However, the three interim rate applications changed this allocation by including GFTs in College Station's transmission revenue requirement. The inclusion of GFTs constituted 47.04% of its total revenue requirement in Docket No. 34230, 48.73% in Docket No.

35837, and 39.43% in Docket No. 46847. *Id*. at 17:13-17. Ms. Stark concluded that it was improper for College Station to use the interim rate proceedings to change the allocation of its GFT between its transmission and distribution functions. *Id*. at 17:20-22. Ms. Stark concluded that the improper inclusion of GFTs in College Station's interim rates resulted in an over-recovery, with carrying charges, of $31.5 million between 2007 and June 30, 2022. *Id*. at 18:14-15.

On August 16, 2022, the parties filed an unopposed settlement agreement resolving all contested issues related to College Station's application and requiring College Station refund $3.9 million. RR, AR Item 192 at 1-2. However, on January 26, 2023, the Commission rejected the settlement agreement because the evidentiary record revealed that College Station included GFTs in its interim rates that were not included in its most recently approved comprehensive TCOS review. RR, AR Item 68 at 1-2. The Commission then remanded the proceeding to SOAH for further processing in accordance with its order.

On May 2, 2023, SOAH held a hearing on remand. The presiding Administrative Law Judges ("ALJs") issued a Proposal for Decision ("PFD") finding that the Commission had already determined that College Station violated the TCOS Rule, and the only issue was the amount of the refund. RR, AR Item 102 at 26. The PFD provided numerous options for calculating the refund but recommended that the Commission exercise its discretion in determining the refund

11

amount. *Id*. at 40. On September 14, 2023, the Commission rejected the PFD because the ALJs did not provide their own findings of fact and conclusions of law on all contested issues. RR, AR Item 113 at 1. The Commission remanded the proceeding to address all issues, including whether it was permissible for College Station to include GFT payments in its interim TCOS filings. *Id*.

On December 21, 2023, the ALJs issued a PFD on remand finding that Commission policy and precedent did not support the recoverability of the GFTs included in College Station's interim rates. RR, AR Item 134 at 2. The ALJs found that College Station did not "update" its previously approved expenses but instead included an entirely new expense that had not been approved in its prior comprehensive rates. *Id* at 27. The ALJs concluded that the purpose of interim rate applications is to provide an expedited process to update invested capital, not to set a new rate structure. *Id*. Therefore, the ALJs concluded that College Station's interim TCOS proceedings resulted in an over recovery of costs and that the Commission has the discretion to require a full, partial, or no refund. *Id*. at 41. The ALJs recommended the Commission grant a good-cause exception to the full-refund requirement and instead require a partial refund. *Id*. at 47.

During the open meeting on February 15, 2024, the Commission adopted the PFD in part and rejected it in part. The Commission adopted the ALJs' finding that a refund of the over-recovered amounts was appropriate. RR, AR Item 167 at 13.

The Commission also concluded that College Station violated the TCOS Rule when it included GFTs as an expense item in its interim TCOS rates that were not approved in its comprehensive rate case. *Id*. at 3. However, the Commission rejected the ALJs' recommendation that College Station partially refund the over-recovered costs. The Commission concluded that the circumstances of the case did not constitute good cause to grant an exception to the full refund required by the rule. *Id*. at 4. The Commission also found that College Station had understated its depreciation expenses in each of its interim TCOS filings, which resulted in $3,485,333 of under-recovery. *Id*. at 13. The Commission concluded that College Station's under-recovery should be netted against its over-recovery. *Id*. Therefore, the Commission's Final Order required College Station to refund $26,254,093, the full amount of over-recovered costs minus under-recovered costs, including carrying charges, over a fifteen-year period. *Id*. at 19.

**STANDARD OF REVIEW**

This is an administrative appeal of a final order of the Commission following a contested-case hearing. PURA authorizes judicial review of a final order of the Commission under the substantial evidence rule. Tex. Util. Code § 15.001.

Under the substantial evidence rule, the Court may reverse and remand for further proceedings an agency decision that is: (1) in violation of a constitutional or statutory provision; (2) in excess of the agency's statutory authority; (3) made

13

through unlawful procedure; (4) affected by other error of law; (5) not reasonably supported by substantial evidence; or (6) otherwise arbitrary, capricious, or characterized by abuse of discretion. Tex. Gov't Code § 2001.174(2).

However, even if the Court finds error on any of these six bases, the Court may only reverse the agency's decision if the substantial rights of the appellant have been prejudiced by the error. *Id.*; *Dyer v. Tex. Comm'n on Env't Quality*, 646 S.W.3d 498, 514 (Tex. 2022). Review of an agency decision under the substantial evidence rule is confined to the record developed before the agency, and the Court may not substitute its judgment for that of the agency on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code §§ 2001.174, 2001.175(e); *Tex. Comm'n on Env't Quality v. Maverick Cnty.*, 642 S.W.3d 537, 544 (Tex. 2022).

In reviewing an agency's factual findings and conclusions for substantial evidence, the issue before the Court is not whether the agency reached the correct conclusions but whether there is some basis in the record for its action. *Maverick Cnty.*, 642 S.W.3d at 544. Although substantial evidence is more than a mere scintilla, the evidence in the record may preponderate against the agency's decision and nonetheless amount to substantial evidence. *Pub. Util. Comm'n of Tex. v. Tex. Indus. Energy Consumers*, 620 S.W.3d 418, 427 (Tex. 2021). The Court may even disagree with the reasons given by the agency in its order and still affirm the order

as long as the Court finds that a reasonable basis exists in the record for the action taken by the agency. *Id.* at 426. The Court presumes that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence. *City of El Paso v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 179, 185 (Tex. 1994). The burden to prove otherwise is on the party challenging the agency decision. *Id.*

The reviewing court also considers whether an agency decision is arbitrary, capricious, or characterized by an abuse of discretion. Tex. Gov't Code § 2001.174(2)(F). "Although an administrative decision that is supported by substantial evidence is generally not arbitrary and capricious," there are a few "narrow circumstances" where a court may reverse an agency order as arbitrary and capricious even when it is supported by substantial evidence. *Tex. Comm'n on Env't Quality v. Friends of Dry Comal Creek*, 669 S.W.3d 506, 517 (Tex. App.—Austin 2023, pet. denied) (internal quotation omitted). Those circumstances may arise when the agency: (1) fails to consider a factor the Legislature directs it to consider; (2) fails to follow the clear, unambiguous language of its own regulations; (3) denies the appellant due process so as to prejudice its substantial rights; (4) considers an irrelevant factor; or (5) considers only relevant factors but still reaches a completely unreasonable result. *Id.*

Essentially, the reviewing court must determine whether the agency genuinely engaged in reasoned decision-making. *Heritage on San Gabriel Homeowners Ass'n*

15

*v. Tex. Comm'n on Env't Quality*, 393 S.W.3d 417, 423 (Tex. App.—Austin 2012, pet. denied). While the arbitrary-and-capricious standard encourages the Court to examine whether the agency has "taken a hard look at the salient problems," it should not be interpreted as a broad, all-encompassing standard for reviewing the rationale of agency decisions. *Friends of Dry Comal Creek*, 669 SW.3d at 518; *see also Tex. Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 454 (Tex. 1984).

## SUMMARY OF THE ARGUMENT

The Commission's Final Order requiring College Station to refund $26 million in over-recovered costs is supported by substantial evidence and was not arbitrary, capricious, or an abuse of discretion. In each of its points of error, College Station fails to show that the Commission committed reversible error. Accordingly, this Court should affirm the district court's judgment upholding the Commission's Final Order.

First, the Commission properly concluded that the TCOS Rule did not permit College Station to include GFTs in its interim rates that were not approved in its comprehensive rates. Interim rates serve the narrow purpose of allowing utilities to update their transmission rates to reflect changes in invested capital resulting from the addition or retirement of transmission facilities. 16 Tex. Admin. Code § 25.192(h)(1). The GFT that College Station included in its interim rates was not a

change in invested capital but rather an entirely new expense that College Station expressly agreed not to recover in its comprehensive rate case and constituted additional revenue for the city. College Station's rate of return was set in its comprehensive rate case at 6.71%, and College Station was required to maintain that rate of return in its interim rates. The inclusion of GFTs in its interim rates substantially increased its effective rate of return above the rate of return approved in its comprehensive rate case. Because the inclusion of GFTs in College Station's interim rates was not a change in invested capital and it increased College Station's effective rate of return above the return set in its comprehensive rate case, the Commission correctly concluded that it was improper for College Station to include GFTs in its interim rates.

Second, the Commission properly applied the TCOS Rule that required College Station to refund the full amount of over-recovery from the improper inclusion of GFTs in its interim rates. Interim rates are temporary and subject to review and reconciliation during the utility's next comprehensive rate case. Any amounts that the Commission determines are unreasonable or unnecessary are subject to full refund. 16 Tex. Admin. Code § 25.192(h)(2). Because the Commission concluded following comprehensive review that the inclusion of GFTs in its interim rates was improper, the TCOS Rule required that the full amount of over-recovery be refunded. The Commission concluded that the circumstances of

this case did not satisfy a good cause exception to excuse compliance with the full-refund requirement. Therefore, the Commission concluded that College Station was required to refund ERCOT ratepayers the full amount of over-recovery, plus carrying charges, that College Station received from its interim rates.

## ARGUMENT

**I.   The Commission correctly concluded that College Station improperly added GFTs in it interim rates because they were not first approved in its comprehensive rates.**

The Commission did not adopt a new rule or standard and apply it retroactively to College Station. This case raised an issue of first impression and was the first instance of a utility including a GFT in its interim rates that was not first approved in its comprehensive rates. The interim rate procedure serves the limited purpose of allowing utilities to update their transmission rates to reflect changes in invested capital, and changes to taxes and depreciation resulting from changes in invested capital. 16 Tex. Admin. Code § 25.192(h)(1). College Station violated both the TCOS Rule, and the 1997 rate order, by including GFTs in its interim transmission rates that were not first approved in its comprehensive rate case. Under the settlement agreement adopted in the 1997 rate order, College Station agreed that it would not recover any GFTs in its transmission rates. Then, starting in 2007, College Station violated that order by including GFTs in its interim transmission rates. GFTs are unquestionably not invested capital—they are transfers of revenue

18

to the city designed as a return on investment. Thus, College Station's inclusion of GFTs in its interim rates impermissibly increased its rate of return above that established by the Commission in its first comprehensive rate case.

A. **The GFTs were not a change in invested capital or a change in taxes associated with changes in invested capital.**

This is a case setting College Station's transmission rates, and the Commission's discretion extends throughout the ratemaking process. *Pub. Util. Comm'n of Tex. v. GTE-Sw., Inc.*, 901 S.W.2d 401, 409 (Tex. 1995). Courts have recognized that ratemaking is a complex process that relies on the informed judgment and expertise of the Commission to make projections and estimates in virtually all areas. *Id.* The Commission's discretion in the ratemaking process includes the authority to disallow improper expenses. *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex. 1983).

Under the TCOS Rule, interim rates are designed to be an expedited process and allow for utilities to adjust their wholesale transmission rates to reflect changes in invested capital. 16 Tex. Admin. Code § 25.192(h)(1). Invested capital is also referred to as the utility's rate base and "consists of the cost, less depreciation, of property 'used by and useful to the utility in providing service.'" *Reliant Energy, Inc. v. Pub. Util. Comm'n of Tex.*, 153 S.W.3d 174, 185 (Tex. App.—Austin 2004, pet. denied). In turn, "'[u]sed and useful' refers to 'such property as has been acquired . . . in good faith and held for use in the reasonably near future in order to

19

enable [a utility] to supply and furnish adequate and uninterrupted . . . service.'" *Cities for Fair Util. Rates v. Pub. Util. Comm'n of Tex.*, 924 S.W.2d 933, 935 (Tex. 1996) (quoting *Lone Star Gas Co. v. State*, 153 S.W.2d 681, 698 (Tex. 1941)). Thus, the TCOS Rule allows for updates to invested capital, or the utility's *rate base*, to reflect additions or retirements of *transmission facilities* and changes in taxes and depreciation associated with added or retired transmission facilities. 16 Tex. Admin. Code § 25.192(h)(1).

The rate-filing package for interim rate applications, under the title "Eligible Costs," provides instructions that reiterate the TCOS Rule's requirement that "[t]he update of the rates shall reflect only changes in return on rate base because of additions and retirements of transmission facilities and the associated depreciation expense." RR, AR Item 30 at 10:16-18. Additionally, "[t]he net rate of return (after tax) used in the last TCOS proceeding shall be used." *Id*. at 10:22-23. The initial version of the TCOS Rule did not include the "other associated taxes" category for interim updates, and the rate-filing package was never updated to reflect this change in the rule. RR, AR Item 87 at 7. Absent an update to the rate-filing package to reflect the new category included in the rule, Commission staff treats the "other associated taxes" category the same as depreciation expenses and the rate of return when reviewing a utility's interim rate application. RR, AR Item 94 at PDF 6. Thus, consistent with the plain language of the rule, *any* new amount included in interim

20

rates must be associated with the addition or retirement of transmission facilities. RR, AR Item 30 at 11:3-4.

The TCOS Rule does not permit College Station to include GFTs in its interim rates that were not included in its comprehensive rates. GFTs as a standalone expense item are not an addition or retirement of transmission facilities, the only update that can be made with interim rates. Therefore, any GFT that was previously approved under the category of other associated taxes could only be updated in an interim case to reflect changes associated with the addition or retirement of transmission facilities. Additionally, because the rate of return established in a utility's comprehensive rate case is applied to its interim updates, the utility cannot adjust the rate of return in an interim proceeding through inclusion of previously unapproved revenue transfers to the municipality that are not the result of changes in invested capital.

The inclusion of GFTs in College Station's interim rates was improper because it was not associated with the additions of transmission facilities. Any changes in invested capital could not result in changes in other associated taxes because College Station's rates did not allow for it to recover *any amount* under this category. RR, AR Item 30 at PDF 85. Thus, the GFTs were not associated with any additional transmission investment but rather to its *total* revenue requirement established in its comprehensive rate case. College Station admitted this in its 2007

21

interim rate case when it said, "the adjustment in this filing is based on total transmission revenue requirements since Docket 15762 did not include a payment in lieu of taxes amount." RR, AR Item 30 at 11:30-32. Because the amounts associated with College Station's rate base in Docket No. 15762 are not related to changes in invested capital in College Station's 2007 interim update, they were impermissibly included in College Station's interim TCOS rates.

In College Station's 2007 interim rates, it included $833,330 in the category of taxes other than income taxes to reflect the city's policy of requiring a GFT of 10.5%. RR, AR Item 30 at 13:1. Although this expense was categorized as "payment-in-lieu of taxes," the city policy in effect at the time characterized the GFT as a return on investment and stated that the intent of the transfer was to provide a benefit to the citizens for the ownership of the electric utility. *Id*. at 12:22-24. Thus, the inclusion of this in interim rates was merely extra revenue to the city, not an adjustment of taxes associated with additional transmission facilities, which, again, College Station agreed that it would not recover through its transmission rates. College Station then filed additional interim rate applications in 2008 and 2017, both designed to further increase city revenue by using the same method of calculation for the GFT included in the interim revenue requirement. *Id*. at 12:4-5. The GFT included in College Station's 2008 interim rates was based on the same 2007 city policy, and the city policy in place during the 2017 interim update similarly stated

that the GFT was designed to provide a benefit to the citizens for the ownership of the electric utility. *Id.* at 12:21-13:24.

The Commission concluded that the inclusion of GFTs in College Station's interim rates significantly increased its effective rate of return above the Commission-approved rate of return agreed to in 1997. RR, AR Item 167 at 13. In its 2007 case, the $833,330 additional compensation to the city together with its approved return on rate base of $564,002 totaled $1,397,332. RR, AR Item 30 at PDF 82. College Station's total rate base in the interim proceeding was $8,405,393; therefore, the total return gave College Station an effective rate of return of 16.62%. *Id.* Similarly, the inclusion of GFTs in its interim rates in 2008 brought its effective rate of return to 16.82%, and in 2017 to 13.34%. *Id.* Commission staff's witness, Ruth Stark, noted that "College Station tacitly acknowledges that this item was additional return in the interim TCOS rates by using the [GFT] amount from its 2017 interim case, Docket No. 46847, to justify the reasonableness of its requested return in the current rate case (Docket No. 52728)." *Id.* at 14:11-14. These substantial increases over College Station's Commission-approved rate of return of 6.71% were not permitted by the plain language of the TCOS Rule, which requires the rate of return in the comprehensive rate case to be applied to interim rates.

Contrary to College Station's assertion, the Commission never approved the inclusion of GFTs in its interim rates. Appellant Br. 48-49. "Instead, in those

proceedings, the Commission issued orders approving College Station's request to make interim adjustments to its transmission revenue requirement and wholesale transmission rate in advance of a comprehensive TCOS." RR, AR Item 167 at 3. The approval orders all stated the updated *transmission revenue requirement* resulting from College Station's changes in invested capital was approved, without making any finding about the permissibility of including GFTs through the interim rate procedures. RR, AR Item 36 at PDF 57, 72, 77. These approval orders all stated that they were subject to review during College Station's next comprehensive rate proceeding, and any amount that the Commission determined was unreasonable or unnecessary was subject to refund during reconciliation. *Id*. Thus, the approvals were conditional on this later comprehensive review, and the interim rates, although approved, were temporary and subject to later reconciliation and review. In this proceeding, the Commission's first opportunity to reconcile College Station's three interim rate applications, the Commission concluded that College Station's inclusion of GFTs in its interim rates was unreasonable in light of the 1997 rate order and the TCOS Rule. RR, AR Item 167 at 13.

**B.     The Commission's practice and precedent is to update GFTs in an interim proceeding in proportion to the approved amount in the utility's comprehensive transmission revenue requirement.**

The Commission's conclusion that College Station improperly included GFTs in its interim rates does not mean that GFTs are categorically excluded from a

utility's interim rates. The inclusions by College Station were improper based on the facts of this case, but the Commission has approved GFTs in interim rates under different circumstances following the next comprehensive review.

When a utility increases its GFTs in an interim filing, the Commission has consistently calculated the incremental increase for payments-in-lieu of taxes based on the effective rate the utility received in its last comprehensive rate case. RR, AR Item 30 at 18:3-7. Under this analysis, the Commission looks at the proportional allocation of GFTs in the utility's comprehensive revenue requirement and will allow an increase in GFTs in interim rates that is proportional to the increase in the interim revenue requirement. RR, AR Item 87 at 8. This is consistent with the TCOS Rule, which allows for increases in other associated taxes in the interim revenue requirement if they are associated with the additions of transmission facilities. 16 Tex. Admin. Code § 25.192(h)(1). Commission staff explained that this method is also consistent with the principles of interim rate proceedings because it does not introduce a contentious issue to the expedited interim procedures that do not allow for thorough analysis or an evidentiary hearing for the applicant's request. RR, AR Item 87 at 8. The Commission concluded that this is a reasonable method to update taxes in an interim proceeding. RR, AR Item 167 at 12.

The proportional allocation analysis is what the Commission used in each of the four prior cases relied on by College Station in which a utility increased its GFTs

25

in interim rates. RR, AR Item 186 at 21:19-22:5. In fact, College Station acknowledges that this is how those interim applications were processed. RR, AR Item 173 at 106:9-107:1. In each of the four cases, the update to GFTs was based on the effective rate from the most recent comprehensive rate case, the increase was tied to the increase in transmission investment, and each of the four utilities maintained the proportionate relationship between the GFT and the revenue requirement component in the utility's last comprehensive rate case. *Id*. For example, in CPS Energy's comprehensive rate case, Docket No. 33197, it included a GFT of $13,898,083 and total transmission revenue requirement of $99,272,021. *Id*. at 86:9-15. The GFT proportion of the total revenue requirement was 14%. In its interim rates, CPS Energy adjusted its GFT to $24,299,941 and its total revenue requirement increased to $173,571,010. *Id*. at 87:5-9. Therefore, the increased GFT in its interim rates was 14% of the increased total revenue requirement, and the utility maintained a proportional relationship to the GFT and revenue requirement between its comprehensive rate case and interim rate case. Similarly, in the City of Bryan's interim rate application, it maintained a proportional relationship with its GFT and revenue requirement and explained that its GFT increased because of plant additions and that the TCOS Rule allows an increase in other associated taxes because of an increase in plant additions. *Id*. at 103:2-8.

College Station's inclusion of the GFT in its interim rates, however, was not proportional with the transmission revenue requirement in its comprehensive rate case. The 1997 rate order set College Station's other associated taxes at $0 and its revenue requirement at $495,211. RR, AR Item 30 at PDF 85. In its first interim rate case, College Station included $833,000 in other associated taxes, and its revenue requirement was increased to $1,771,509. *Id*. at PDF 82. Thus, its GFT inclusion was 47.04% of its total revenue requirement, whereas in its comprehensive rate case its proportion of GFT to transmission revenue was 0%. Likewise, in its other two interim cases its GFT proportion to total transmission revenue was 48.73% in 2008 and 39.43% in 2017. *Id*. at 17:15-17. Therefore, the inclusion of GFTs in its interim rates was not proportional to the transmission revenue requirement the Commission set in its final order for Docket No. 15762.

The Commission correctly concluded that the inclusion of GFTs in College Station's interim rates was unreasonable in light of the 1997 rate order and the TCOS Rule. RR, AR Item 167 at 13. The Commission's conclusion is supported by the plain language of the TCOS Rule and expert witness analysis of College Station's comprehensive and interim rates. Thus, the Commission's conclusion was supported by substantial evidence and was not arbitrary or capricious.

**C.     Interim applications serve a narrow purpose and are not designed for utilities to add expenses that were not approved, or that they forgot to request, in their comprehensive rates.**

College Station's claim that it inadvertently did not include a GFT in its first comprehensive rate application because it was dealing with a new regulatory scheme, Appellant Br. 20, is contradicted by the record. College Station *did* include a GFT in its 1996 comprehensive rate application, but that application was resolved by settlement agreement that allocated 100% of the GFT to its distribution function. RR, AR Item 30 at 16:3-5. Furthermore, as Ms. Stark pointed out, College Station was a party to another utility's transmission rate proceeding during the same time as its first comprehensive rate case, and that utility received a GFT in its transmission rates. *Id*. at 16:14-17. Thus, College Station was aware that a GFT could be requested in its transmission rate application. But even if College Station mistakenly allocated 100% of its GFT to its distribution function, this would not excuse it from violating the TCOS Rule and including expenses through the interim rate procedure that it "forgot" to include in its comprehensive rates. The proper method under the rule would be for College Station to file a new comprehensive rate case to allow the Commission to conduct a thorough analysis of College Station's request.

There is no basis for College Station's assertion that it "indisputably" would have received these expenses if it had included them in its first comprehensive rate application. Appellant Br. 50. College Station could have *requested* to include a GFT

in its initial comprehensive rate case, but the Commission would have reviewed the inclusion to determine whether it was a reasonable and necessary cost for providing transmission service. Tex. Util. Code § 35.004(c). The Commission would need to look at the specific purpose of the GFT in place at that time to determine whether it was reasonable and necessary. RR, AR Item 30 at 5:14-15.

Based on the record evidence, College Station *did* request to include the GFT in its comprehensive rates, but it appears that the request was rejected, and it was instead allocated to College Station's distribution function under the settlement agreement. But even if that were not the case, the size of College Station's GFTs in its interim rates—doubling its revenue requirement—raises doubts that the Commission would have approved them even if they were requested in its original comprehensive rate case. It is doubtful that these substantial revenue transfers that were designed as a return on investment and unrelated to the cost of providing transmission service would have been approved as a separate expense item in College Station's first comprehensive rate case.

College Station argues that it is significant that the Commission allowed it to recover GFTs in the transmission rates set going forward in this comprehensive rate proceeding. Appellant Br. 24. However, this *supports* the Commission's conclusion that these expenses can only be approved in a comprehensive rate case. In this proceeding, College Station requested a 9% GFT as a component of its rate of return.

RR, AR Item 2 at PDF 43:17-21. The Commission ultimately granted College Station a 10% rate of return, which includes its requested 9% GFT. RR, AR Item 167 at 15. In other words, College Station is not recovering its requested 9% GFT on top of its Commission approved rate of return, as it was doing by including the GFT under the other associated taxes category in its interim rates. Rather, it received a GFT *as its rate of return*. The fact that College Station was awarded a 9% GFT as its rate of return just reinforces the Commission's conclusion that the inclusion of GFTs in College Station's interim rates impermissibly increased its effective rate of return above its Commission-approved rate of return.

### D. The Commission did not adopt an ad hoc rule to reach its conclusion.

The Commission is not adopting a new standard or a new rule and retroactively applying it to College Station in this proceeding. The Commission's application of the TCOS Rule and its conclusion that these expenses were improperly included in College Station's interim rates falls within its discretion under its statutory ratemaking authority. *Suburban Util. Corp.*, 652 S.W.2d at 362. However, even if the Commission adopted an ad hoc rule to reach this conclusion, which the Commission denies, such rule was validly adopted.

When balancing competing policy considerations, the Commission can choose to implement its policy choice on an ad hoc basis. *Tex. Ass'n of Long Distance Tel. Cos. (Texaltel) v. Pub. Util. Comm'n of Tex.*, 798 S.W.2d 875, 886

(Tex. App.—Austin 1990, writ denied). An ad hoc rule is an agency statement that interprets, implements, or prescribes agency law or policy. *Id*. An agency can make a policy choice through an ad hoc rule if the agency "is confronted with (1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature." *Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 535 (Tex. App.—Austin 2014, pet. denied). "When the agency promulgates an ad hoc 'rule,' the appropriate standard of review for an appellate court is not whether the agency's policy choice is supported by substantial evidence, but whether the choice was arbitrary and capricious." *W. Tex. Utils. Co. v. Off. of Pub. Util. Counsel*, 896 S.W.2d 261, 272 (Tex. App.—Austin 1995, no writ.).

The Commission's conclusion here, if it is an ad hoc rule, is a valid ad hoc rule because it addressed an issue of first impression. College Station is correct that other utilities have *updated* GFTs in interim rate proceedings. Appellant Br. 38. However, this is the first case in which a utility included GFTs in its interim rates that were not first approved in its comprehensive rate case and those inclusions were challenged in the reconciliation of rates during the utility's next comprehensive rate case. RR, AR Item 143 at 3. Therefore, the Commission applied the TCOS Rule to these circumstances in a contested case for the first time in this proceeding. *Id*.

College Station can point to no other case in which a utility included GFTs in interim rates that were not first approved in a comprehensive rate case. Thus, College Station is incorrect that the issue of first impression was in 2007 when College Station updated its rates, Appellant Br. 40; instead, this is the first time the Commission has had to *reconcile* a utility's interim rates that included GFTs not first approved in a comprehensive rate case.

College Station is incorrect that the Commission created a distinction between utilities that included and those that didn't include GFTs in comprehensive rates. Appellant Br. 39. On the contrary, the Commission applied the TCOS Rule that only allows a utility to *update* its taxes that changed because of the addition or retirement of transmission facilities. That College Station's taxes other than income taxes were set at $0 under the 1997 rate order means that *no taxes* changed as a result of its updated invested capital. The Commission's interpretation is not a change to the rule or a change to the categories of costs that may be updated in an interim rate proceeding.

"[W]hen an agency decision involves the balancing of competing interests—such as recovery of revenues proportionate to the costs of providing services versus the impact that large rate increases can have on utility customers—and an evaluation of the equities of the situation, the agency is making a fundamental policy choice." *W. Tex. Utils. Co.*, 896 S.W.2d at 272. Therefore, the Commission's conclusion here

is a fundamental policy choice about what expenses a utility can include in its interim rates. This conclusion is based on the plain language of the TCOS Rule, which only allows for interim updates to reflect changes in invested capital. Thus, if the Commission's conclusion was an ad hoc rule, then the ad hoc rule is valid because this is an issue of first impression and the Commission's conclusion has a rational basis.

## II. The Commission correctly applied the reconciliation provision in its rule to order a refund of the full amount of over-recovery.

The record evidence demonstrates that College Station improperly included expenses in its interim rates that were not first approved in its comprehensive rates. Under the TCOS Rule, any amounts that the Commission determines are unreasonable or unnecessary are required to be refunded to the ratepayers. 16 Tex. Admin. Code § 25.192(h)(2). The Commission concluded that the circumstances of this case did not constitute good cause to excuse College Station from complying with the full refund required by the rule. Thus, the Commission concluded that College Station must refund the ERCOT ratepayers the full amount of over-recovery, plus carrying charges, over a 15-year period—the same amount of time that it was overcharging ERCOT ratepayers with the improper inclusion of GFTs in its transmission rates.

## A. The rule provides that any amount of over-recovery shall be refunded.

College Station's wholesale transmission rates have been interim rates since the effective date of its first interim TCOS proceeding in 2007. Under the TCOS Rule, College Station's interim transmission rates resulting from its three interim rate filings were temporary and subject to reconciliation during its next comprehensive rate case. The TCOS Rule requires that any amounts that the Commission determines are unreasonable or unnecessary, including the corresponding return and taxes associated with plant additions and retirement, be refunded with carrying costs. 16 Tex. Admin. Code § 25.192(h)(2). The interim rate procedure allows for an expedited process for utilities to recover costs of transmission investment without the thorough and time-consuming procedure of a comprehensive rate case. However, the trade-off for this expedited process is that interim rates are temporary and still subject to that thorough review during the utility's next comprehensive rate case.

College Station argues that the reconciliation process only looks at the reasonableness and necessity of plant additions in interim rates and cannot order a refund for separate expense categories. Appellant Br. 49. That reading is contrary to the plain language of the rule. The first sentence of the rule states that "[a]n update of transmission *rates* under paragraph (1) of this subsection shall be subject to reconciliation" at the utility's next comprehensive rate case. 16 Tex. Admin. Code §

25.192(h)(2) (emphasis added). Paragraph (1) states that "the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission authorized rate of return on such facilities." *Id*. § 25.192(h)(1). Therefore, the rates themselves are subject to reconciliation, including the expense categories that were included in the interim filings and constitute the basis of the interim rates.

The second part of the rule reads "at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary." *Id*. § 25.192(h)(2). This provision does not supersede the first part of the rule explaining that interim transmission *rates* are subject to reconciliation. The instruction merely limits the scope of interim TCOS proceedings and reinforces their expedited nature by dictating that the review of plant additions will be conducted during the next comprehensive rate case. This makes clear that the reconciliation of interim rates will occur at the same time the Commission reviews the reasonableness and necessity of interim plant additions. Furthermore, this section of the rule simply emphasizes that the only purpose of interim rate proceedings is to update *invested capital*. College Station's interpretation of the rule would mean that utilities could circumvent the Commission's oversight by including improper expenses in an expedited interim rate proceeding, and the Commission would have

35

no authority to recover those improper inclusions during the utility's next comprehensive review.

Because the inclusion of GFTs was improper, the full amount of over-recovery that College Station received during the 15-year period that it was charging interim rates is subject to refund. The Commission's conclusion is based on the plain language of the TCOS Rule and was not arbitrary or capricious.

### B. The Commission correctly concluded that the circumstances of this case did not constitute good cause to excuse the full-refund requirement.

The Final Order is not a penalty for College Station, but a refund, required by the rule, to all the consumers in the ERCOT market that paid excessive transmission rates resulting from the improper inclusion of GFTs in College Station's interim rates. However, under the Commission's procedural rules, the Commission can grant an exception to comply with any requirement of its rules for good cause. 16 Tex. Admin. Code § 22.5(b). Therefore, the core of College Station's argument is not whether it was impermissible to include GFTs in its interim rates (it was) or whether it is required under the rule to refund the full amount (it is) but that the Commission should exercise its discretion to find that good cause exists to excuse the full-refund requirement. The Commission concluded based on the totality of the facts in the record that the circumstances of this case did not constitute good cause to excuse compliance with the requirement that College Station refund the full amount of over-

recovery in its interim rates. RR, AR Item 167 at 5. Thus, in reaching this decision, the Commission effectively declined to depart from the default rule of requiring a full refund of over-recovery.

> **i.** **The Commission's conclusion was supported by substantial evidence.**

The basis of College Station's good cause argument is communications between College Station and Commission staff during two of the interim rate proceedings. However, these communications do not create the definitive conclusion that College Station portrays and, in fact, show that College Station was informed that the ultimate decision on whether GFTs were allowed in interim rates would be made by the Commission and, ultimately, subject to review and reconciliation. In its 2007 interim rate proceeding, Commission staff informed College Station it could include the GFT and "they would make the call as to whether it would be allowed." RR, AR Item 36 at PDF 17. In its 2008 interim rate proceeding, College Station again contacted Commission staff and explained its intended calculation for including GFTs in its interim rates, and Commission staff said, "to go ahead with your inclination" but to "be sure and fully explain the issue in any testimony you include with your filing." *Id*. at PDF 59.

These statements by Commission staff were not statements by the Commission nor do they bind the Commission. The decision-making authority resides in the Commission, not the Commission staff. *City of Frisco v. Tex. Water*

*Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. App.—Austin 1979, writ ref'd n.r.e.). Furthermore, the two statements by Commission staff never affirmatively said that it *was* allowed, and both pointed towards a future determination by the Commission at the next comprehensive review. College Station only sought the Commission staff's guidance in the 2007 and 2008 interim rate cases, but not in 2017. What was not anticipated or known in the 2007 and 2008 proceedings was that College Station would go so long between filing the interim rate applications and the comprehensive rate application and forestall the Commission's review and interpretation of the application of the TCOS Rule. RR, AR Item 143 at 3. Commission staff's communications with College Station are entirely consistent with the orders approving interim rates and the Commission's ultimate conclusion in this proceeding that it was improper to include GFTs in its interim rates.

The statutory scheme establishing the Commission grants decision-making authority with the Commissioners. *See* Tex. Util. Code §§ 12.001, .051. Commission staff serve the agency, and the Commission may accept or reject Commission staff recommendations in whole or in part. *City of Frisco*, 579 S.W.2d at 72. In this case, the Commission staff and the ALJs recommended that the Commission find good cause to excuse the full-refund requirement. The Commission was authorized to, and did, reject their recommendation. RR, AR Item 167 at 5.

College Station argues that there was no evidence in the record to support the Commission's discretionary conclusion declining to find good cause to excuse the refund required by the TCOS Rule. Appellant Br. 51. The basis of College Station's argument is that the Commission staff witness, Ruth Stark, supplemented her testimony to recommend the Commission find good cause. *Id*. However, Ms. Stark did not change her testimony regarding the impermissibility of College Station including GFTs in its interim rates that were not included in its comprehensive rates. RR, AR Item 44 at 1:23-2:12. Ms. Stark merely changed her recommendation from requiring a full refund to finding good cause existed to require only a partial refund upon learning about the prior communications between Commission staff and College Station. *Id*. at 2:13-3:2.

However, the Commission has the discretion of whether to grant a good cause exception, not its staff, and other portions of Ms. Stark's testimony support the Commission's Final Order. *Cent. Power & Light Co. v. Pub. Util. Comm'n of Tex.*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied) ("In weighing evidence, the agency may accept or reject the testimony of witnesses or may accept part of a witness's testimony and disregard the remainder."). Therefore, the record evidence supporting the Commission's decision to not grant a good cause exception includes the applications themselves (showing that College Station impermissibly included GFTs in its interim rates) and Ms. Stark's testimony analyzing these applications.

39

RR, AR Item 44 at 1:23-2:12. The default rule, applied by the Commission here, is that the full amount of over-recovery is subject to refund. 16 Tex. Admin. Code § 25.192(h)(2). Thus, the Commission's decision is consistent with the law and supported by substantial evidence. *Charter Med.-Dall., Inc.*, 665 S.W.2d at 452 ("The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency.").

### ii. The Commission's conclusion was not an abuse of discretion.

This case is an example of the risks that College Station willingly undertook by relying on interim rates for 15 years. College Station had some understanding that there was an issue with including GFTs in its interim rates that it had not included in its comprehensive rates; otherwise, it would not have sought guidance from Commission staff on how to proceed. It also knew that the rates were temporary and subject to reconciliation during the next comprehensive rate proceeding, as stated in the approval orders. Despite this, and without ever receiving a determination by the Commission that it was proper to include GFTs in its interim rates, College Station waited 15 years before filing a new comprehensive rate case. The risks College Station undertook in these circumstances are particularly glaring because this is an issue that the Commission has never addressed. RR, AR Item 94 at PDF 4-5. Commission staff themselves were without guidance on how the Commission interpreted the TCOS Rule under these circumstances because the

40

Commission had never done so before. College Station could have resolved any uncertainty about its interim rates by filing a comprehensive rate case, but it chose to rely on the Commission staff's interpretation for 15 years before coming to the Commission to get the definitive answer.

The difference between the comprehensive and interim proceedings is evident in the timeframes in which they are processed. For example, College Station's 2007 interim rate proceeding was 84 days from when its application was filed to when the Commission issued its approval order, *see* RR AR Item 36 at PDF 54, 58, its 2008 interim application was 74 days, *see id*. at PDF 69, 73, and in 2017 it was 36 days. *See id*. at PDF 75, 78. In contrast, College Station's first comprehensive rate case was 14 months from filing the application to approval, *see id*. at PDF 35, and the comprehensive rate application at issue here was almost three years from the date College Station filed its application to the date the Commission issued its Final Order. *See* RR, AR Item 167 at 6, 22. As these timeframes demonstrate, the time and resources devoted to a comprehensive review is considerably more than an expedited interim rate proceeding. The Commission has consistently rejected proposed changes to the interim TCOS process that would "complicate and undermine the purpose of and process for interim TCOS filings"[2] or "substantially alter the nature

---

[2] Pub. Util. Comm'n of Tex., *Rulemaking Proceeding to Amend SUBST. R. § 25.192(g) Related to Transmission Service Rates*, Project No. 37519, Order Adopting Amendment to § 25.192 as

of interim TCOS filings and significantly complicate and lengthen their processing."[3]

The Office of Public Utility Counsel ("OPUC") and Texas Industrial Energy Consumers ("TIEC"), intervenors in the administrative proceeding, consistently argued that College Station refund the full amount of over-recovery, as required by the TCOS Rule. In fact, even after Ms. Stark supplemented her testimony, OPUC and TIEC continued to adopt the recommendation in her direct testimony that College Station refund the full amount of over-recovery. RR, AR Items 74, 75. As OPUC pointed out, they were not a party to any of the interim rate proceedings, and this was the first opportunity to contest College Station's inclusion of GFTs in its interim rates. RR, AR Item 119 at 5.

Generally, no parties intervene in interim rate proceedings. As TIEC explained, the interim rate process is designed to be formulaic and uncontroversial. RR, AR Item 128 at 1. TIEC argued that allowing College Station to retain the over-recovery would invite abuse to the interim rate procedure because Commission staff and intervenors would have a difficult time analyzing and responding to requests that fall outside the limited scope of interim updates because of the expedited nature of the process. *Id.* at 11. This would incentivize utilities to overcharge ratepayers by

---

Approved at the July 30, 2010 Open Meeting, at 17 (Aug. 4, 2010), https://interchange.puc.texas.gov/search/documents/?controlNumber=37519&itemNumber=39.
[3] *Id.* at 19.

including improper expenses in their interim rates just as College Station did. *Id.* Furthermore, it would be unjust to ratepayers to prevent them from recouping the over-recovery that College Station received from including improper expenses in its interim rates. *Id.* at 9. The size of the refund, resulting from College Station waiting 15 years to file a comprehensive rate application, does not provide an excuse to the full refund requirement and to shift the risk that College Station willingly undertook onto the ERCOT ratepayers. *Id.*

The Commission has the statutory duty to ensure that rates are just and reasonable. Tex. Util. Code § 11.002(a). What did not change despite Ms. Stark's later recommendation, and what OPUC and TIEC consistently argued, was the reason she initially recommended a full refund. Granting College Station an exception to the full-refund requirement would not serve as a strong deterrent for adding inappropriate items to interim transmission rates, an action that negatively impacts not only other utilities, but consumers in the entire ERCOT market. RR, AR Item 30 at 20:15-19. Granting an exception for College Station would allow it to circumvent Commission rules and procedures to recover costs that other utilities would not be permitted to recover. To ensure that all utilities are treated the same, and to ensure that all ratepayers in ERCOT are charged just and reasonable rates, the Commission concluded that College Station must comply with the full refund as required by the TCOS Rule. College Station's choice to not file a comprehensive

43

rate application for 15 years does not allow it to retain over-recovered costs that other utilities would not be permitted to recover.

The Commission concluded that good cause did not exist to excuse the full-refund requirement. The Commission's conclusion was based on application of the TCOS Rule to the evidence in the record, and the Commission did not abuse its discretion by not finding good cause to excuse compliance with its rules.

### iii. The Commission properly rejected the ALJs' recommendation.

The Commission properly modified the PFD to reject the ALJs' recommendation that the Commission find good cause to excuse the full refund required by the rule. The Legislature granted the Commission more authority to modify an ALJ's findings than other state agencies. *Sw. Pub. Serv. Co. v. Pub. Util. Comm'n of Tex.*, 962 S.W.2d 207, 214 (Tex. App—Austin 1998, pet. denied). Under the Texas Government Code, the Commission has the authority to modify an ALJ's finding of fact if it is not supported by a preponderance of the evidence. Tex. Gov't Code § 2003.049(g)(1)(B). Therefore, the Legislature granted the Commission the authority to assume an original fact-finding role. *Sw. Pub. Serv. Co.*, 962 S.W.2d at 213. Consequently, the Commission has the authority to substitute its judgment for the ALJ's on a question of fact and to reevaluate the evidence to determine whether the ALJ's findings are supported by a preponderance of the evidence. *Id*. at 214.

When the Commission modifies an ALJ's findings, it is required to state the specific reason and legal basis for the modification. *Id.*

College Station's incorrectly relies on Texas Government Code § 2001.058 to challenge the Commission's decision to modify the PFD. Appellant Br. 56. The Austin Court of Appeals held that "[s]ection 2003.049(g), a statute applicable only to Commission proceedings, expressly supercedes APA section 2001.058." *Sw. Pub. Serv. Co.*, 962 S.W.2d at 212. Thus, the Commission is not required to give any deference to an ALJ's findings and has the authority to weigh the evidence anew. *Id.* at 214. The court found that the Legislature intended the Commission to have more control over the ultimate disposition of cases because of the complexity of public utility matters. *Id.*

The Commission stated both the specific reason and the legal basis for rejecting the ALJs' recommendation to find good cause. The Commission explained that "Commission Staff's communications or College Station's good faith are [not] circumstances that constitute good cause to grant an exception to the full refund required by the rule." RR, AR Item 167 at 4. The legal basis was that the ALJs applied an inapplicable legal standard used when the Commission exercises its discretion to order a mitigated refund to weigh the evidence to find good cause. *Id.* at 6. Rather, under the TCOS Rule a utility is required to refund the full amount of over-recovery to the ratepayers, and College Station requested a good-cause

exception under the Commission's procedural rules to excuse the requirement of the TCOS Rule. Therefore, College Station had the burden to prove good cause. *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 482 (Tex. 1984) (the burden of proof is on the party seeking affirmative relief).

Based on the evidence in the record, the Commission concluded that College Station did not meet its burden. The fact that Commission staff incorrectly told College Station to include GFTs in its interim rates (subject to Commission review and reconciliation) and College Station's good faith are not grounds to excuse it from compliance with the Commission's rules and to allow it to retain $26 million in over-recovery.

## PRAYER

For the foregoing reasons, the district court correctly affirmed the Commission's Final Order. College Station has failed to show any reversible error. Accordingly, the Commission respectfully requests that the Court affirm the district court's judgment affirming the Final Order.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KELLIE E. BILLINGS-RAY
Chief, Environmental Protection Division

 /s/ Jordan Pratt
JORDAN PRATT
Assistant Attorney General
State Bar No. 24140277
Jordan.Pratt@oag.texas.gov

JOHN R. HULME
Special Counsel
State Bar No. 10258400
John.Hulme@oag.texas.gov

Environmental Protection Division
Office of the Attorney General
P.O. Box 12548, MC 066
Austin, Texas 78711-2548
Phone: (512) 463-2012
Fax: (512) 320-0911

**Attorneys for Appellee Public Utility
Commission of Texas**

47

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9.4(i)(3) of the Texas Rules of Appellate Procedure, I certify that this brief contains 11,408 words, as calculated by Microsoft Word, the computer program used to create this document.

*/s/ Jordan Pratt*
JORDAN PRATT

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been forwarded to the following attorneys via the Court's electronic filing case management system and/or electronic mail on September 15, 2025.

Thomas L. Brocato
tbrocato@lglawfirm.com
Roslyn M. Warner
rwarner@lglawfirm.com
LLOYD GOSSELINK ROCHELLE &
TOWNSEND, P.C.
816 Congress Avenue, Ste. 1900
Austin, Texas 78701
Tel: (512) 322-5800
Fax: (512) 472-0532

Adam C. Falco
afalco@cstx.gov
City Attorney
COLLEGE STATION CITY
ATTORNEY'S OFFICE
P.O. Box 9960
1101 Texas Ave.
College Station, Texas 77842
Tel: (979) 764-3746
Fax: (979) 764-3481

*Counsel for Appellant*
*City of College Station*

Benjamin Barkley
benjamin.barkley@opuc.texas.gov
Justin Swearingen
justin.swearingen@opuc.texas.gov
Chris Ekoh
chris.ekoh@opuc.texas.gov
OFFICE OF PUBLIC UTILITY
COUNSEL
1701 N. Congress Avenue, Ste. 9-180
P.O. Box 12397
Austin, Texas 78711
Tel: (512) 936-7500
Fax: (512) 936-7525

*Counsel for Intervenor*
*Office of Public Utility Counsel*

*/s/ Jordan Pratt*
JORDAN PRATT

49

**INDEX TO APPENDIX**

**Tab 1**     Direct Testimony of Ruth Stark (AR 30)

**Tab 2**     Attachment RS-6 to Direct Testimony of Ruth Stark (AR 30)

**Tab 3**     OPUC's Statement of Position (AR 74)

**Tab 4**     TIEC's Statement of Position (AR 75)

**Tab 5**     16 Tex. Admin. Code § 25.192

**Tab 6**     16 Tex. Admin. Code § 22.35

**Tab 7**     16 Tex. Admin. Code § 22.5

# Appendix Tab 1

Direct Testimony of Ruth Stark (AR 30)

SOAH DOCKET NO. 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
PUC DOCKET NO. 52728

| APPLICATION OF THE CITY OF | § | BEFORE THE STATE OFFICE |
|---|---|---|
| COLLEGE STATION TO CHANGE | § | OF |
| RATES FOR WHOLESALE | § | ADMINISTRATIVE HEARINGS |
| TRANSMISSION SERVICE | § | |
| | § | |



DIRECT TESTIMONY OF RUTH STARK

RATE REGULATION DIVISION

PUBLIC UTILITY COMMISSION OF TEXAS

JUNE 22, 2022

## TABLE OF CONTENTS

I. QUALIFICATIONS ................................................................................................1

II. PURPOSE OF TESTIMONY ..................................................................................2

III. SUMMARY OF COLLEGE STATION'S REQUEST ..............................................3

IV. STAFF REVENUE REQUIREMENT .....................................................................4

    A.   General Fund Transfer ...................................................................................4
          1.   Test Year ...............................................................................................6
          2.   Reconciliation of Interim TCOS Rates .................................................8

    B.   Prepayments ................................................................................................21
    C.   Rate-Case Expenses ....................................................................................21

## ATTACHMENTS

Attachment RS-1      Staff Transmission Cost of Service

Attachment RS-2      Response to Staff 5-1

Attachment RS-3      Response to Staff 6-1

Attachment RS-4      City of College Station 2007 - 2008 Approved Annual Budget, Fiscal and Budgetary Policy: F3

Attachment RS-5      2017 – 2018 Approved Annual Budget City of College Station at F-4, Fiscal and Budgetary Policy Statements

Attachment RS-6      Revenue Requirement Comparisons

Attachment RS-7      Docket No. 15762 Revenue Requirement and Rate Base

Attachment RS-8      Interim TCOS Over-Collection Plus Carrying Charges

Attachment RS-9      Refund Interim TCOS Over-Collection Plus Carrying Charges

Attachment RS-10    Alternative Interim TCOS Over-Collection Plus Carrying Charges

Attachment RS-11    Refund Alternative Interim TCOS Over-Collection Plus Carrying Charges

Attachment RS-12    Response to Staff 5-5

Attachment RS-13    List of Previous Testimony

Attachment RS-14    Workpapers

## I. QUALIFICATIONS

**Q. Please state your name and business address.**

A. Ruth Stark, 1701 North Congress Avenue, Austin, Texas 78711.

**Q. By whom are you employed and in what capacity?**

A. I am employed by the Public Utility Commission of Texas (Commission) as a Senior Regulatory Accountant in the Rate Regulation Division.

**Q. What are your principal responsibilities?**

A. My responsibilities include testifying as a witness on accounting matters in rate cases and other proceedings at the Commission and participating in the overall examination, review, and analysis of rate change and other applications.

**Q. Please briefly state your educational background and professional experience.**

A. I received a Bachelor of Business Administration degree with a major in Accounting from the University of Texas at Austin in 1983. I am a Certified Public Accountant licensed in the State of Texas. I have accounting experience in public practice, industry, and state government. My public accounting responsibilities included tax and financial services to individuals, private enterprises, and non-profit organizations. As the accountant for a multi-divisional construction, engineering, and surveying company, I oversaw all accounting functions from maintaining the general ledger through financial statement and tax return preparation. At the Texas Water Development Board, I performed administrative duties associated with a federal construction grant program and state revolving loan fund related to municipal capital improvement projects. Except for the three-month period encompassing October through December of 2015, I have been employed with the Public Utility Commission of Texas since September of 1990. Prior

to my retirement in September of 2015, I held the position of Director of Financial Review in the Rate Regulation Division for 16 years.

Q.    **Have you previously testified before the Commission?**

A.    Yes. Attachment RS-11 presents a summary of the dockets in which I have testified.

II.   **PURPOSE OF TESTIMONY**

Q.    **What is the purpose of your testimony in this proceeding?**

A.    The purpose of my testimony is to present Staff's revenue requirement and rate base for the City of College Station's (City) municipally owned utility (College Station) based on its transmission cost of service (TCOS) application filed on November 3, 2021.[1] Additionally, I make recommendations on specific items in College Station's request and address the reconciliation of amounts included in its interim TCOS rates since its last comprehensive rate case.

Q.    **Which specific items in College Station's application do you address in your testimony?**

A.    My testimony addresses the transfer of funds by College Station to the City's general fund, the balance of prepayments included in the requested rate base, and the requested rate-case expenses for this and other proceedings.

Q.    **What is the basis of your recommendation?**

A.    My recommendation is based on my review and analysis of College Station's testimony and other information in its application, its responses to various requests for information, the additional information filed in support of its requested rate-case expenses, and information provided by College Station in previous proceedings.

---

[1] *Application of the City of College Station to Change Rates for Wholesale Transmission Service*, Docket No. 52728 (Application) (Nov. 3, 2021).

**Q.  What statutory provisions are relevant to the application of College Station?**

A.  I am applying the standards set forth in Texas Utilities Code Title II, the Public Utility Regulatory Act (PURA). Chapter 35 of PURA governs the provision of transmission service by municipally owned utilities like College Station.

**Q.  What Commission rules did you consider when reviewing the reasonableness of College Station's request in this proceeding?**

A.  I considered the provisions of 16 Texas Administrative Code (TAC) § 25.192 that set forth the specific components that are the basis for transmission service rates as well as its provisions related to the interim update of transmission rates. I also considered 16 TAC § 25.231, otherwise known as the Commission's cost of service rule, and 16 TAC § 25.245, which governs the determination of the reasonableness of rate-case expenses for electric utilities subject to PURA Chapter 36.

**Q.  On whose behalf are you testifying?**

A.  I am testifying on behalf of the Commission Staff.

**III.  SUMMARY OF COLLEGE STATION'S REQUEST**

**Q.  Please summarize College Station's request in this case.**

A.  College Station requests an annual revenue requirement of $6,006,601 for transmission service provided within the Electric Reliability Council of Texas (ERCOT).[2] College Station also requests approval of a rate-case expense surcharge to recover over a six-month period all of its reasonable and necessary rate-case expenses associated with this and other proceedings.[3] College Station's requested revenue requirement is based on a test year reflecting the 12-month period ending September 30, 2020, the end of the City's

---

[2] Application at 1.

[3] *Id* at 4.

2020 fiscal year.[4] College Station's last comprehensive rate case was Docket No. 15762.[5]

## IV. STAFF REVENUE REQUIREMENT

**Q. Please summarize Staff's revenue requirement and rate base for College Station.**

A. Staff's revenue requirement is $5,539,721 and Staff's rate base is $25,276,407 based on the recommendations of Staff witnesses Emily Sears, Heidi Graham, and myself. The Staff recommended revenue requirement and rate base are presented on Attachment RS-1 appended hereto. Please refer to the testimonies of Ms. Sears and Ms. Graham for details regarding their recommendations. Additionally, I recommend that College Station be allowed to recover rate-case expenses of $149,627 for this proceeding. Furthermore, I recommend College Station be ordered to refund amounts erroneously collected through interim TCOS rates totaling approximately $31.5 million, including associated carrying charges. My recommendations are discussed below. Finally, in addition to the adjustments in Staff's revenue requirement, Staff may recommend additional adjustments in a statement of position and post-hearing pleadings.

### A. General Fund Transfer

**Q. Please explain your first proposed adjustment to College Station's request.**

A. My first proposed adjustment is a reduction of $263,701 to the requested in-lieu-of-franchise fee general fund transfer included in the return on rate base calculation.

**Q. What is a general fund transfer?**

A. Most cities that own utilities make annual fund transfers from their municipal utilities into the cities' general funds to be used for general purposes. This type of transfer is

---

[4] *Id.*, Direct Testimony of Grant S. Rabon (Rabon Direct) at 5:1-3.

[5] *City of College Station Filing in Compliance with Subst. R. 23.67*, Docket No. 15762, Order (Jul. 7, 1997).

referred to by different names based on how the ordinance or policy that created it is designed. The most common types of general fund transfers are called payments in lieu of taxes, other taxes and fees, gross receipts tax, public utility assessments, property taxes, and franchise fees. As the different names suggest, the amounts transferred are also calculated in different ways based on the specific purpose of the transfer as outlined in the ordinance or policy that authorize the transfer. Some methods of determining the amount of payment include a percentage of gross operating revenue, a property tax equivalent, a flat amount paid annually, and a per kilowatt-hour sold charge. College Station uses the terms "Franchise Requirement," "General Fund Transfer," "Payment in Lieu of Taxes," and "In-Lieu-of Franchise Fee" to describe a single transfer fee.[6]

**Q.    What is your general approach in a comprehensive rate case to evaluating the reasonableness of a general fund transfer amount a city proposes to include in its revenue requirement?**

A.     I evaluate the city's stated purpose of the transfer and the reasonableness of the proposed transfer in light of that purpose. As part of that evaluation, I may compare the proposed amount to the general fund transfers the city makes from utility functions other than the transmission function and to comparable types of costs for other types of utilities such as investor-owned utilities. A general fund transfer is commonly placed into one of two general categories of costs: return on rate base or taxes other than income taxes. Note that a general fund transfer is not a tax but nevertheless may be categorized as such in setting the municipal utility's rates.

---

[6] City of College Station's Response to Commission Staff's Fifth Request for Information (College Station's Response to Staff's Fifth RFI) Question No. Staff 5-1(a) (Apr. 18, 2022). *See* Attachment RS-2.

**DIRECT TESTIMONY OF RUTH STARK**

1.    **Test Year**

**Q.    Please explain College Station's request for the test year in this proceeding.**

A.    College Station witness Grant Rabon states that:

> [t]he amount included for Taxes Other than Income Taxes in the 2017 [interim TCOS] Filing was related to the General Fund Transfer (also referred to as Payment in Lieu of Taxes). However, as previously stated, in the Current Filing the General Fund Transfer is included as part of the Return under the cash flow method. Thus, this cost has moved from Taxes Other than Income Taxes in the 2017 Filing to Return in the Current Filing.[7]

Mr. Rabon also explains that the general fund transfer included in the return calculation is based on 9% of operating revenues as an in-lieu-of franchise fee consistent with Section 3.9 of the City's financial policies.[8]

**Q.    What does Section 3.9 of the City's financial policies state with respect to the general fund transfer?**

A.    Section 3.9 of the City's financial policies states the following:

The intent of this transfer is to provide a benefit to the citizens for their ownership of the various utility operations.

An in-lieu-of-franchise fee is included as part of the rate computation of the transfer and is consistent with the franchise rates charged to investor owned utilities franchised to operate within the city.

  1.  Electric Fund In-Lieu-of-Franchise Fee – The in-lieu-of-franchise fee will be calculated based on kWh usage at a rate of that would equate to an approximate 9.0% franchise fee. The final total transfer amount will not exceed 9.0% of total estimated operating revenues.[9]

**Q.    Please discuss your adjustment to College Station's requested general fund transfer.**

A.    I propose to reduce the rate of the general fund transfer to 5% of transmission operating revenues. As explained in the City's financial policy, outlined above, the in-lieu-of-

---

[7] Rabon Direct at 8:17-21.

[8] Rabon Direct at 10:12-17.

[9] College Station's Response to Staff's Fifth RFI Question No. Staff 5-1(c) at 6. *See* Attachment RS-2.

franchise payment is included "consistent with the franchise rates charged to investor-owned utilities operating within the City." College Station's Response to Staff RFI No. 6-1(b) shows that the actual franchise rate charged to other utilities operating within the City is 5%.[10]

In response to Staff RFI No. 5-1(f), College Station explained that "the in-lieu-of-franchise fee is a subset of the General Fund Transfer, but it does not make up the entire transfer percentage."[11] As a follow-up to this response, Staff requested that College Station provide each subset of the general fund transfer and the transfer percentage associated with each such that the total equals the 9% requested. College Station replied that "The General Fund Transfer (GFT) is 9% of College Station's gross revenues. The 9% is not broken down into specific subsets."[12]

Because the City's financial policy states the in-lieu-of-franchise fee is intended to be consistent with the franchise rates charged to investor-owned utilities franchised to operate within the City, College Station has only supported the reasonableness of an in-lieu-of-franchise payment of 5%, because that is the rate charged to other utilities operating within the City. College Station has not provided any information to support the reasonableness of the additional requested 4% other than to say that it is approved within the City's annual budget.[13]

College Station was also asked to provide the rationale for the decision to specifically adopt a rate of 9% as opposed to some other rate. Rather than provide the rationale, College Station merely referenced the City's approved annual budgets.[14] As

---

[10] City of College Station's Response to Commission Staff's Sixth Request for Information (College Station's Response to Staff's Sixth RFI) Question No. Staff 6-1(b) (May 20, 2022). *See* Attachment RS-3.

[11] College Station's Response to Staff's Fifth RFI Question No. Staff 5-1(f). *See* Attachment RS-2.

[12] College Station's Response to Staff's Sixth RFI Question No. Staff 6-1(a). *See* Attachment RS-3.

[13] *Id.*

[14] College Station's Response to Staff's Fifth RFI Question No. Staff 5-1(d). *See* Attachment RS-2.

the party with the burden of proof, College Station did not provide justification to support the 9% rate.

**2.     Reconciliation of Interim TCOS Rates**

Q.     **Do you have any other issues with respect to College Station's transfers to the City's general fund?**

A.     Yes.   In reviewing the reasonableness of College Station's requested general fund transfer in this proceeding, I attempted to compare the requested transfer rate of 9% of revenues to the rate approved for the general fund transfer in its last comprehensive rate case, Docket No. 15762.   In doing so I discovered that there was no approved general fund transfer amount included in the taxes other than income taxes category in College Station's revenue requirement in that case.   Because the testimony of Mr. Rabon in the current case references "the 2017 proceeding," I reviewed College Station's interim TCOS rate proceedings under 16 TAC § 25.192(h)(1) that followed Docket No. 15762 and found that general fund transfers had been included in the interim TCOS rates approved in those cases.   Because there was no general fund transfer included in the taxes other than income taxes category in College Station's approved revenue requirement in Docket No. 15762, and because interim TCOS rates set between comprehensive rate cases are subject to reconciliation, I performed a detailed review of the general fund transfer amount included in the interim TCOS rates.

Q.     **Please explain what is meant by interim TCOS rates.**

A.     The Commission's Substantive Rule 16 TAC § 25.192(h) provides that transmission service providers (TSPs) in the ERCOT region may update their transmission rates on an interim basis to reflect changes in invested capital:

(h)     **Interim Update of Transmission rates.**
(1)     **Frequency.** Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per

calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to § 25.193 pursuant to an order in Project Number 37909, *Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF)*, that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission-authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

**Q.     Please explain what you mean by reconciliation of College Station's interim TCOS rates since its last comprehensive rate case.**

A.     The substantive rule outlined above explains that the rates can be updated on an interim basis. The rule also provides for a reconciliation of rates established in the interim proceedings:

> (2)     **Reconciliation.** An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying charges shall be calculated using the TSP's rate of return authorized in that complete review.

Note that what the rule refers to as "complete review of the TSP's transmission cost of service" is what I refer to in my testimony as a comprehensive rate case.

Q.    **How many times did College Station update its rates on an interim basis since its last comprehensive rate case?**

A.    College Station updated its rates on an interim basis three times since its last comprehensive rate case in the following proceedings:

Docket No. 34230[15]

Docket No. 35837[16]

Docket No. 46847[17]

Q.    **Please explain how the interim rates are determined.**

A.    As shown above, the rule requires that interim rates reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the Commission-authorized rate of return on such facilities as well as changes in loads. Additionally, the interim TCOS rate filing package explains the following:

> Eligible costs – The update of the rates shall reflect only changes in return on rate base because of additions and retirements of transmission facilities and the associated depreciation expense as defined in Substantive Rule 25.193(a)(1).[18]  [Note:  while the RFP only addresses return and depreciation expense, the rule allows updates to associated taxes.]
>
> Rate of return – The net rate of return (after tax) used in the last TCOS proceeding shall be used.  If a Non-IOU [non-investor-owned utility] did not file its last TCOS rate case using the rate of return method, then the rate of return used for the interim update shall be based on an imputed rate

---

[15] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to P.U.C. Subst. R. 25.192(g)(1)*, Docket No. 34230, Order (Jul. 23, 2007).

[16] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to P.U.C. Subst. R. 25.192(g)(1)*, Docket No. 35837, Order (Sep. 12, 2008).

[17] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates*, Docket No. 46847, Notice of Approval (Mar. 17, 2017).

[18] Interim Wholesale Transmission Rate Filing Package Instructions at 4.

of return.   The imputed rate of return will be calculated from the information filed in the previous TCOS case.[19]

As the rule and interim TCOS filing package explain, the new amounts included in interim rates are associated with the addition and retirement of transmission facilities.

**Q.   Do you take issue with College Station's interim rates from these three proceedings?**

A.    Yes.  I have determined that College Station included amounts in its interim rates that are inconsistent with 16 TAC § 25.192(h)(1) and the revenue requirement approved by the Commission in College Station's last comprehensive rate case.

**Q.   Please explain why you contend that College Station included amounts in its interim rates that are inconsistent with 16 TAC § 25.192(h)(1) and the revenue requirement approved by the Commission in College Station's last comprehensive rate case.**

A.    In 2007, in Docket No. 34230, College Station's first interim TCOS update after the Docket No. 15762 comprehensive rate case, College Station included in its interim revenue requirement on the line labeled "Taxes Other Than Income Taxes" what it described as:

> [p]ayments in lieu of taxes that are transfers by the Electric Department to the general fund of the City of College Station.  P.U.C. SUBST. R. § 25.192(g)(1) allows for the "addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission-allowed rate of return on such facilities as well as changes in loads."  In accordance with P.U.C. SUBST. R. § 25.192(g)(1), and referencing other TCOS interim filings from municipalities, the City has included a Schedule F-1 in this filing to calculate a payment in lieu of taxes amount which is reflected as an annual increase amount in Schedule A.  As shown on Schedule F-1, the payment by the Electric Department is based upon total revenues.  The total payment is split between transmission and distribution functions based upon net plant since revenues support capital and the City only owns transmission and distribution plant.  In addition, the adjustment in this filing is based on total transmission revenue requirements since Docket No. 15762 did not include a payment in lieu of taxes amount.[20]

---

[19] *Id.*

[20] Docket No. 34230, Direct Testimony of Timothy Crabb at 5:25 – 6:11.

The quotes from P.U.C. SUBST. R. § 25.192(g)(1) are from the predecessor to the current 16 TAC § 25.192(h)(1) quoted above and contained similar language. College Station included similar testimony in support of its claimed "payments-in-lieu-of taxes" in Docket Nos. 35737 and 46847.[21] Payments in lieu of taxes (PILOT) represent what the utility would have to pay on its facilities if they were subject to ad valorem tax like other types of utilities such as investor-owned utilities.

**Q.    How is the inclusion of what College Station described as "payments in lieu of taxes" in its interim transmission rates inconsistent with 16 TAC § 25.192(h)(1)?**

A.    General fund transfers are included as return or taxes other than income taxes in setting a municipal utility's transmission rates in comprehensive rates cases and provide compensation to a city for its ownership of the utility. Because no general transfer amount was included in the taxes other than income taxes category in College Station's last comprehensive rate case, College Station's inclusion of an amount for payments in lieu of taxes in the taxes other than income taxes in its interim transmission rates effectively increased College Station's rate of return beyond what the Commission authorized in College Station's last comprehensive rate case. In addition, although College Station represented in Docket Nos. 34230, 35837, and 46847 that the request was for payments in lieu of taxes, nothing in the City's financial policies in effect at the time of these interim updates describes the transfers to the general fund as payments in lieu of taxes. The policy in effect at the time of Docket Nos. 34230 and 35837 stated:[22]

> Payment for Return on Investment. The intent of this transfer is to provide a benefit to the citizens for the ownership of the various utility operations they own. This transfer will be made in accordance with the following two methods, not to exceed 10% of the total estimated operating

---

[21]    Docket No. 35837, Direct Testimony of Timothy Crabb at 6:5-16 and Docket No. 46847, Direct Testimony of Timothy Crabb at 6:6-17.

[22]    City of College Station 2007 – 2008 and 2008 – 2009 Approved Annual Budgets, Fiscal and Budgetary Policy: F3-F4. *See* Attachment RS-4.

revenues for the Water and Wastewater Funds, 10.5% for the Electric Fund, and 7% for the Sanitation Fund:

1.  *In-Lieu-of-Franchise-Fee.* In-lieu-of-franchise fee will be included as a part of the rate computation at 4% of gross sales consistent with the franchise rates charged to investor owned utilities franchised to operate within the City.

2.  *Return on Investment.* The Return on Investment will be calculated at 8% of total Fund Equity.

The third interim TCOS proceeding, Docket No. 46847, was filed in 2017 using the same method of calculation even though the City's financial policy with respect to the general fund transfer was changed in 2012 and the policy for the update year was as follows:

(b) Utility Transfer to General Fund. The intent of this transfer is to provide a benefit to the citizens for their ownership of the various utility operations. An in-lieu-of-franchise fee is included as part of the rate computation of the transfer and is consistent with the franchise rates charged to investor owned utilities franchised to operate within the City.

1.  Electric Fund

    1.In-Lieu-of-Franchise Fee – The in-lieu-of-franchise fee will be calculated based on kWh usage at a rate that would equate to an approximate 8.0% franchise fee. The final total transfer amount will not exceed 8.0% of total estimated operating revenues.[23]

Both of these policies state that the intent of the general fund transfer is to provide a benefit to the citizens for the ownership of the various utility operations. The interim TCOS rule addresses the return to be used in interim proceedings and does not permit additional return above the amount that is provided by multiplying the approved or implied rate of return from the last comprehensive rate case by the net additional plant investment.

**Q. What impact did this additional return have on College Station's interim TCOS rates?**

---

[23] 2017 – 2018 Approved Annual Budget City of College Station, at F-4, Fiscal and Budgetary Policy Statements. *See* Attachment RS-5.

A.  The impact of including this additional return in the interim rates of College Station was that College Station's interim rates reflected a much higher effective rate of return than it was allowed based on the Commission-approved rate of return of 6.71%[24] from its last comprehensive rate case. The return dollars produced by the approved rate of return plus the amounts included in the interim rates as payments in lieu of taxes resulted in an effective rate of return included in the interim TCOS rates set in Docket No. 34230 of 16.62%; an effective rate of return included in the interim TCOS rates set in Docket No. 35837 of 16.82%; and an effective rate of return of 13.34%, as shown on Attachment RS-6. This additional return violated the provisions of 16 TAC § 25.192(h)(1) that limited the rate of return to 6.71%.

College Station tacitly acknowledges that this item was additional return in the interim TCOS rates by using the general fund transfer amount from its 2017 interim case, Docket No. 46847, to justify the reasonableness of its requested return in the current rate case (Docket No. 52728), stating:

> [A]s shown in Table 1, the sum of the $1,476,306 for the Taxes Other Than Income Taxes (representing the General Fund Transfer) and $1,494,893 for Return in the 2017 Filing equals $2,971,199. Thus, the requested Return in the Current Filing, which includes the General Fund Transfer, is almost the same as the corresponding amounts approved in the 2017 Filing.[25]

Q.  **What are your comments about the general fund transfer policies' references to "In-Lieu-of-Franchise-Fee"?**

A.  Franchise fees charged to investor-owned utilities are payments for the use of a city's rights-of-way and are not a payment for taxes. Additionally, my review of the most recent comprehensive rate cases of the four investor-owned utility transmission and distribution providers in ERCOT found that 100% of the municipal franchise fees were

---

[24] Docket No. 15762, Order, Attachment to the Order (Jul. 7, 1997).

[25] Rabon Direct at 11:19-23.

allocated to the distribution function and none to the transmission function.[26] Nevertheless, as I discussed previously, College Station has requested that a general fund transfer be included in it revenue requirement in this case and I am recommending that the general fund transfer included in College Station's return be set equivalent to the franchise fee that the City charges investor-owned utilities. My recommendation is based on College Station's general fund transfer policy and prior comprehensive rates cases in which the Commission has approved return for other municipal utilities that include an amount for in-lieu-of-franchise fee.

**Q.    Do you have any additional basis for recommending that the so-called payments in lieu of taxes were inappropriately included in College Station's interim TCOS rates?**

A.    Yes. In the 1996 – 1997 timeframe, the Commission conducted a separate proceeding for each utility that owned transmission facilities within ERCOT to set initial wholesale transmission rates for that utility.[27] Docket No. 15762 was the proceeding that the Commission conducted for College Station during that timeframe and is its last comprehensive rate case. The issues in that case were resolved by a settlement agreement of the parties and the revenue requirement approved by the Commission based on that agreement did not include payments in lieu of taxes:[28]

---

[26] *See Application of Texas-New Mexico Power Company to Change Rates,* Docket No. 48401 at Schedule II-E-2, *Application of CenterPoint Energy Houston Electric, LLC for Authority to Change Rates,* Docket No. 49421 at Schedule II-E-2, *Application of AEP Texas, Inc. for Authority to Change Rates,* Docket No. 49494 at Schedule II-E-2, and *Application of Oncor Electric Delivery Company LLC for Authority to Change Rates,* Docket No. 53601 at Schedule II-E-2.

[27] Docket No. 15762 Order at 1.

[28] Docket No. 15762, Order and Revision Schedule A-1: Transmission Cost of Service, Provided as WP Sched A-1 in Docket No. 34230. *See* Attachment RS-7.

**DIRECT TESTIMONY OF RUTH STARK**

| Rev. Requirement Approved: | Total | Production | Transmission | Distribution |
|---|---|---|---|---|
| Fuel & Purch. Power | 23,336,462 | | | 23,336,462 |
| O&M | 1,492,894 | | 102,595 | 1,390,299 |
| Interest on Customer Deposits | 44,917 | | | 44,917 |
| Depreciation | 880,829 | | 175,023 | 705,806 |
| Taxes Other Than Income Taxes | 1,434,060 | | | 1,434,060 |
| Federal Income Tax | | | | |
| Return on Rate Base | 1,890,265 | | 217,593 | 1,672,672 |
| Total Revenue Requirement | 29,079,427 | | 495,211 | 28,584,217 |

This schedule shows that there was $0 included as taxes other than income taxes for the transmission function and that the entire amount of taxes other than income taxes ($1,434,060) was allocated to the distribution function.

**Q.** **Did other municipal utilities receive approval to include taxes other than income taxes in their transmission revenue requirements at that time?**

**A.** Yes, other municipal utilities received approval to include payments in lieu of taxes (PILOT) or a similar general fund transfer in their revenue requirements in their initial comprehensive rate cases.

**Q.** **Is there other important background information relevant to this issue?**

**A.** Yes. The inclusion of PILOT in transmission revenue requirement and the allocation of PILOT to the transmission function were contested issues in at least one case around the time of College Station's Docket No. 15762. College Station was a party to the joint Texas Municipal Power Agency and City of Bryan proceeding, Docket No. 15296, in which the Commission allowed PILOT in the City of Bryan's TCOS rates, specifically in the taxes other than income taxes revenue requirement category.[29]

---

[29] *Inquiry of the Public Utility Commission of Texas Under Section 2.056 of PURA Relating to Transmission Service Provided by the Texas Municipal Power Agency and the City of Bryan to the City of College Station,* Third Order on Rehearing at Finding of Fact No. 61 (Mar. 31, 1997).

**DIRECT TESTIMONY OF RUTH STARK**

Q.    **Why is this background information important?**

A.    This background information is important because it shows that the parties in College Station's last comprehensive rate case explicitly agreed that no amount of money should be included as taxes other than income taxes in College Station's approved TCOS even though College Station was a party in another similar case during the same timeframe in which money was included in that category. This is especially important when the amount of the general fund transfer is such a large percentage of the TCOS revenue requirement in each of the interim proceedings. Such proceedings are on an accelerated timeline and there is no time for a stringent review of the costs included therein as there is in a comprehensive rate case.

Q.    **What was the general fund transfer as a percentage of revenue requirement included in College Station's three interim TCOS proceedings?**

A.    For the interim rates set in Docket No. 34230 (the first interim TCOS case) the amount in the taxes other than income taxes category of $833,330 was 47.04% of the total interim revenue requirement of $1,771,509 adopted in that proceeding.[30] The percentage of revenues attributable to the general fund transfer was also high for Docket No. 35837 (48.73%)[31] and Docket No. 46847 (39.43%).[32]

Q.    **Should College Station have used the interim TCOS update mechanism to include in its TCOS rates for the first time payments in lieu of taxes?**

A.    No, College Station should not have used the interim TCOS mechanism to add this item to its TCOS rates, especially because in its last base rate proceeding 100% of the taxes other than income taxes was allocated to the distribution function.

---

[30] *See* Attachment RS-5.

[31] *Id.*

[32] *Id.*

**Q.** **What about College Station's reference to the interim TCOS update filings of other municipalities as support for its payment in lieu of taxes in the interim proceedings?**

**A.** Unlike College Station, other ERCOT municipal utilities received approval to include payments in lieu of taxes in their initial comprehensive rate cases. In addition, for those utilities, the calculation of the incremental amount for the payments in lieu of taxes in an interim TCOS update proceeding can be based on the most recent comprehensive rate case, specifically the effective rate for payments in lieu of taxes.

**Q.** **How much has College Station over-collected since 2007 as a result of including in its interim TCOS updates payments in lieu of taxes?**

**A.** As shown on Attachment RS-8, College Station has over-collected approximately $19.2 million through June 30, 2022.

**Q.** **Does that amount include any carrying charges at College Station's authorized rate of return as provided for in 16 TAC § 25.192(h)(2)?**

**A.** No. The inclusion of carrying charges at College Station's authorized rate of return increases the over-collected balance to $31.5 million through June 30, 2022.[33]

**Q.** **Did the Commission approve College Station's requested interim TCOS rates in each of the three interim proceedings?**

**A.** Yes. However, the Commission's orders in all three interim update proceedings stated that the rates were subject to reconciliation.

**Q.** **College Station's total revenue requirement request in this case is approximately $6 million. Given this fact, how is it reasonable for Staff to recommend that College Station refund over $31 million?**

---

[33] *See* Attachment RS-8.

A.   College Station opted to forego comprehensive rate cases since 1997. This is what can happen to a utility when it chooses not to apply for a comprehensive rate case for many years and the Commission does conduct a comprehensive review of what has been included in interim rates during those years. The Commission should not allow a utility to inappropriately include a revenue requirement item in interim TCOS proceedings and not refund amounts inappropriately recovered because the amount of refund is large compared to its total TCOS revenue requirement.

Q.   **What is your recommendation with respect to College Station refunding the over-collection?**

A.   Given that the over-collection occurred over a period of fifteen years, I recommend that it be refunded over a period of fifteen years. Because 16 TAC § 25.192(h)(2) requires that, beginning with the effective date of the rates set in this proceeding carrying charges are to be calculated using the rate of return authorized in this case, carrying charges on the over-collection during the refund period should be based on Staff's recommended rate of return of 8.9%. This results in an annual refund of approximately $3.8 million assuming the refund begins in July 2022.[34] The amount will change based on the actual date that the refund begins.

Q.   **In the event the Commission determines that it was appropriate for College Station to have included so-called payments in lieu of taxes in the interim TCOS proceedings, do you have an alternative recommendation?**

A.   Yes. 100% of the taxes other than income taxes in College Station's last comprehensive rate case were allocated to the distribution function with none allocated to the transmission function. Because there was $0 of payments in lieu of taxes allocated to the transmission plant in that proceeding and because the interim TCOS rule only permits

---

[34] *See* Attachment RS-9.

increases in the revenue requirement that are a result of additions of new plant not included in the last comprehensive rate case, it was inappropriate for College Station to include payments in lieu of taxes associated with transmission plant included in its last comprehensive rate case.

In other words, if it was appropriate for College Station to add payments in lieu of taxes in its interim TCOS proceedings, it was only appropriate to add the amount attributable to the incremental transmission plant additions and not to the total transmission plant as the Commission had already assigned $0 to the plant that existed as of the end of the test year in the last comprehensive rate case. At a minimum, the amount associated with the plant in service as of the end of the test year in the last base rate case should be excluded as it was specifically assigned a value of $0 in that case.

**Q. What would be the over-collected amount under this alternative recommendation?**

A. Under this alternative recommendation, the over-collected amount would be $3.9 million through June 30, 2022 without carrying charges.[35] Including College Station's authorized rate of return results in a total over-collected amount of $6.6 million.[36] To be clear, I am not advocating for this alternative, as I believe adopting it would not be consistent with the Commission's rules and its order in College Station's last comprehensive rate case and would not serve as a strong deterrent for adding inappropriate items to interim TCOS rates. I am merely providing this approach as an additional alternative for consideration by the Commission.

**Q. What is your refund proposal should the Commission adopt this alternative recommendation?**

---

[35] *See* Attachment RS-10.

[36] *Id.*

A.  My recommendation is to use the same refund period and carrying charge rate. This would result in an annual refund of $800,575.[37] Once again, this is assuming the refund begins in July 2022. The amount will change based on the actual date that the refund begins.

## B.    Prepayments

Q.  **Please explain your adjustment to College Station's requested prepayments balance.**

A.  College Station explained in discovery that it enters prepaid expense at fiscal year-end.[38] Each month will have a zero balance until year-end, and at the beginning of the next fiscal year the balance is reversed.[39] I have excluded the requested transmission prepayments balance of $6,130 because the balance was recorded in the last month of fiscal year 2020 and then immediately reversed in the next month.

## C.    Rate-Case Expenses

Q.  **Please explain College Station's request related to rate-case expenses.**

A.  College Station requests recovery of its reasonable and necessary rate-case expenses incurred for this proceeding and for expenses associated with two of its interim TCOS proceedings, Docket No. 34230 and Docket No. 46847. College Station proposes to recover these amounts through a surcharge assessed over a six-month period.[40] The amounts requested are as follows:[41]

|                  |              |
|------------------|--------------|
| Docket No. 34230 | $ 11,228.90  |
| Docket No. 46847 | $ 10,636.90  |

---

[37] *See* Attachment RS-11.

[38] College Station's Response to Staff's Fifth RFI, Question No. Staff 5-5(2). *See* Attachment RS-12.

[39] *Id.*

[40] Application at 4.

[41] College Station's Third Supplemental Response to Staff's Second RFI, Question No. Staff 2-1(c) (May 22, 2022).

Docket No. 52728      <u>$149,626.54</u>

Total      $171,492.34

**Q.**    **What is your recommendation with respect to the requested rate-case expenses?**

**A.**    I recommend that the expenses requested for this proceeding, Docket No. 52728, be approved for recovery. These amounts include legal expenses incurred through April 30, 2022 and consulting expenses incurred through May 15, 2022. I have reviewed the documentation provided by College Station, including the affidavits of Thomas Brocato of Grant Rabon. Using 16 TAC § 22.245 as a guide, the requested rate-case expenses were supported by detailed monthly billings and other documentation and based on my review of the information provided, I found that the requested expenses are reasonable and recoverable under PURA § 35.004(c). More specifically I found that:

- The requested amount of rate-case expenses does not include fees paid to, tasks performed by, or time spent on a task by an attorney or other professional that were either extreme or excessive.

- The requested amount of rate-case expenses does not include expenses incurred for lodging, meals and beverages, transportation, or other services or materials that were either extreme or excessive.

- The requested amount of rate-case expenses does not contain any amounts for duplication of services or testimony.

- The requested amount of rate-case expenses is not disproportionate, excessive, or unwarranted in relation to the nature and scope of the proceedings for which College Station is seeking recovery or reimbursement.

College Station indicated that it expects to update its requested expenses for this proceeding on a monthly basis.

**Q.**    **What is your recommendation with respect to the rate-case expenses requested for the interim update proceedings, Docket No. 34230 and Docket No. 46847?**

**DIRECT TESTIMONY OF RUTH STARK**

A.    I recommend that recovery of the rate-case expenses for the two interim proceedings be denied.

**Q.    Please explain your recommendation.**

A.    I recommend that recovery of these expenses be denied in this proceeding because the Commission does not typically provide for recovery of rate-case expenses associated with interim TCOS update proceedings through a separate rider.  Because 16 TAC § 25.192(h) permits utilities to file interim TCOS updates twice per year, the test year amount of costs associated with these proceedings are typically included in base rates as recurring regulatory commission expense.  College Station incurred no test year expenses of this type because its last interim TCOS proceeding was five years ago.  College Station provided no testimony or compelling reason why the Commission should deviate from its customary treatment of expenses associated with interim TCOS proceedings.  Additionally, as discussed previously, College Station only had three interim TCOS proceedings since its last comprehensive rate case 25 years ago, and the expenses associated with Docket No. 34230 were incurred 15 years ago.  Dividing the total cost of $21,866 for the two interim proceedings by 25 equals an expense of only $875 per year.

**Q.    Does this conclude your testimony?**

A.    Yes.

# Appendix Tab 2

Attachment RS-6 to Direct Testimony of
Ruth Stark (AR 30)

Docket No. 52728
College Station
Interim TCOS Review/Reconciliation

| | | Original TCOS Filing Docket No. 15762 | Interim TCOS Docket No. 34230 | Interim TCOS Docket No. 35837 | Interim TCOS Docket No. 46847 |
|---|---|---|---|---|---|
| | Rev. Requirement Approved: | | | | |
| 1 | O&M | 102,595 | 102,595 | 102,595 | 102,595 |
| 2 | Depreciation | 175,023 | 271,582 | 374,767 | 670,525 |
| 3 | Taxes Other Than Income (GF Transfer) | | 833,330 | 1,228,955 | 1,476,306 |
| 4 | Federal Income Tax | | | | |
| 5 | Return on Rate Base | 217,593 | 564,002 | 815,888 | 1,494,893 |
| 6 | Total Revenue Requirement | 495,211 | 1,771,509 | 2,522,205 | 3,744,319 |
| 7 | GF Transfer as Percent of Revenues | 0.00% | 47.04% | 48.73% | 39.43% |
| 8 | Last Full Rate Case Authorized ROR 6.71% | | | | |
| 9 | Rate Base | 3,244,666 | 8,405,393 | 12,159,291 | 22,278,586 |
| 10 | GF Transfer + Return on Rate Base | 217,593 | 1,397,332 | 2,044,843 | 2,971,199 |
| 11 | Effective Return on Rate Base | 6.71% | 16.62% | 16.82% | 13.34% |

# Appendix Tab 3

OPUC's Statement of Position (AR 74)



# Filing Receipt

**Filing Date - 2023-04-26 03:24:57 PM**

**Control Number - 52728**

**Item Number - 106**

| APPLICATION OF THE CITY OF | § | PUBLIC UTILITY COMMISSION |
|---|---|---|
| COLLEGE STATION TO CHANGE | § | |
| RATES FOR WHOLESALE | § | OF TEXAS |
| TRANSMISSION SERVICE | § | |

## OFFICE OF PUBLIC UTILITY COUNSEL'S
## STATEMENT OF POSITION

The Office of Public Utility Counsel ("OPUC"), representing the interests of residential and small commercial consumers in Texas, respectfully submits this Statement of Position pursuant to 16 Texas Administrative Code ("TAC") § 22.124. Having reviewed the application and filings of the parties, OPUC takes the following position:

Just as Texas Industrial Energy Consumers ("TIEC") has,[1] OPUC adopts and supports the positions taken by Staff of the Public Utility Commission's ("Staff") witness Ruth Stark in her Direct Testimony filed June 23, 2022.[2] City of College Station's ("College Station") most recent comprehensive transmission cost of service ("TCOS") review before the Commission was approved on July 8, 1997 in Docket No. 15762,[3] and at no time has the Public Utility Commission of Texas ("Commission") authorized College Station to recover payments-in-lieu-of-taxes ("PILOT"), categorized as taxes other than income taxes, in its wholesale transmission rates.

OPUC wholly supports the position taken by the Commission in its January 26, 2023, Order Remanding Proceeding:

Under 16 TAC § 25.192(h), each transmission service provider in the Electric Reliability Council of Texas (ERCOT) region may apply to update its transmission

---

[1] Texas Industrial Energy Consumers' Statement of Position (Aug. 1, 2022). ("TIEC Statement").

[2] Direct Testimony of Ruth Stark (Jun. 23, 2022). ("Stark Direct").

[3] *City of College Station Filing in Compliance with Subst. R. 23. 67*, Docket No. 15762. Order (Jul. 8, 1997).

1

rates on an interim basis "to reflect changes in its invested capital." The updated rates "shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission-authorized rate of return on such facilities as well as changes in loads." Rates updated in an interim TCOS proceeding are subject to reconciliation and amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, must be refunded.

College Station's most recent comprehensive TCOS review before the Commission was approved on July 8, 1997, in Docket No. 15762. The Commission-approved revenue requirement in that proceeding did not include payments-in-lieu-of-taxes or any taxes. Instead, the Commission ordered that College Station's tax expense allocated to the transmission function was $0.

*The evidentiary record shows that College Station included general fund transfers (categorized as taxes other than income) in its interim TCOS. The record also shows that by including the general fund transfers in its interim TCOS, College Station has been increasing its rate of return above what the Commission approved in Docket No. 15762.*

*College Station was not authorized to include general fund transfer payments in its interim TCOS by either Commission order or rule. College Station's general fund transfers were not transmission-related invested capital, federal income tax, or other associated taxes under 16 TAC § 25.192(h). The amounts were not taxes owed to any taxing entity but were instead transfers from the electric department of the City of College Station to the general fund.* Thus, under the rule, College Station was not authorized to include the general fund transfers in the interim revenue requirements in an interim TCOS proceeding. Additionally, because the Commission did not approve the inclusion of general fund transfers in College Station's revenue requirement in Docket No. 15762, College Station violated the Commission's order by including the amounts in the updated revenue requirements in the interim TCOS proceedings.

*Thus, the Commission finds that College Station's wholesale transmission rates updated in the interim TCOS proceedings were in violation of 16 TAC § 25.192 and the Commission's order in Docket No. 15762.*[4] [Emphasis added]

---

[4] Order Remanding Proceeding at 1-2 (Jan. 26, 2023). (internal citations omitted).

2

As TIEC has accurately noted: Although the Commission never authorized College Station to allocate any portion of its PILOT to the transmission function or recover those amounts in its wholesale transmission rates, College Station began allocating PILOT to the transmission function beginning in its 2007 interim TCOS proceeding. This practice continued throughout its next two interim TCOS filings in 2008 and 2017. In those interim filings, College Station modified the Commission-approved allocation percentage for its "Taxes Other Than Income Taxes," and that modification allowed College Station [to] collect approximately $19.2 million through its wholesale transmission rates that was never authorized by a Commission rate order. Taking carrying charges into account, College Station has recovered approximately $31.5 million in unauthorized transmission charges. These amounts should be refunded so ratepayers do not ultimately bear the cost of College Station charging rates that were never authorized by the Commission.[5]

In keeping with Ms. Stark's direct testimony, TIEC's Statement of Position, and the Commission's Order Remanding Proceeding, OPUC recommends that the applicant be directed to refund the over-collected $19.2 million, which amounts to approximately $31.5 million with carrying charges,[6] over such period of time as the Commission deems reasonable.

OPUC reserves the right to participate in the hearing, cross-examine witnesses, and file briefs related to the issue addressed herein. OPUC further requests such other relief to which it may be entitled.

---

[5] TIEC Statement at 2. (internal citations omitted).

[6] *See* Stark Direct at 18 (noting, "College Station has over-collected approximately $19.2 million through June 30, 2022…The inclusion of carrying charges at College Station's authorized rate of return increases the over-collected balance to $31.5 million through June 30, 2022.").

3

Date: April 26, 2023

Respectfully submitted,

Courtney K. Hjältman
Chief Executive & Public Counsel
State Bar No. 24070294

Justin Swearingen
Senior Assistant Public Counsel
State Bar No. 24096794
Renee L. Wiersema
Assistant Public Counsel
State Bar No. 24094361
Chris Ekoh
Deputy Public Counsel
State Bar No. 06507015
**OFFICE OF PUBLIC UTILITY COUNSEL**
1701 N. Congress Avenue, Suite 9-180
P.O. Box 12397
Austin, Texas 78711-2397
512/936-7500 (Telephone)
512/936-7525 (Facsimile)
justin.swearingen@opuc.texas.gov (Service)
renee.wiersema@opuc.texas.gov (Service)
chris.ekoh@opuc.texas.gov (Service)
opuc_eservice@opuc.texas.gov (Service)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all parties of record in this proceeding on this 26th day of April 2023, by facsimile, electronic mail, and/or first class, U.S. Mail.

Justin Swearingen

4

# Appendix Tab 4

TIEC's Statement of Position (AR 75)



# Filing Receipt

**Filing Date -** 2023-04-27 02:32:38 PM

**Control Number -** 52728

**Item Number -** 107

| APPLICATION OF CITY OF | § | |
|---|---|---|
| COLLEGE STATION TO CHANGE | § | BEFORE THE STATE OFFICE |
| RATES FOR WHOLESALE | § | OF |
| TRANSMISSION SERVICE | § | ADMINISTRATIVE HEARINGS |

## TEXAS INDUSTRIAL ENERGY CONSUMERS' STATEMENT OF POSITION

### I. INTRODUCTION

Texas Industrial Energy Consumers (TIEC) files this statement of position pursuant to 16 Tex. Admin. Code § 22.124(a). TIEC represents businesses that own large manufacturing and industrial sites throughout ERCOT and who have wholesale transmission costs passed through to them in their retail rates. As such, TIEC has an interest in ensuring that transmission providers like the City of College Station ("College Station") only recover Commission-authorized costs for providing wholesale transmission service. As explained below, there is no dispute that since 2007, College Station recovered approximately $19.2 million through its transmission rates that it was never authorized to collect by the Commission.[1] Those amounts should be refunded, plus carrying charges, over a period of time that the Commission finds to be reasonable.

### II. STATEMENT OF POSITION

TIEC adopts and supports the positions taken by Commission Staff witness Ruth Stark in her direct testimony filed on June 23, 2022.[2] As Ms. Stark explained, College Station was not authorized to recover payments in lieu of taxes (PILOT)—also referred to as "Taxes Other Than Income Taxes"—in its wholesale transmission rates.[3] PILOT are payments that College Station's electric utility makes to the city to compensate it for the use of public rights-of-way and to provide residents with what amounts to a return on their ownership interest in the utility.[4] In College Station's last full transmission cost-of-service (TCOS) case, which concluded twenty-five years ago, the Commission's order stated that College Station's tax expense for the transmission function

---

[1] Order Remanding Proceeding at 2 (Jan. 26, 2023).

[2] Direct Testimony of Ruth Stark (Stark Dir.) (June 23, 2022).

[3] Stark Dir. at 11-13.

[4] Stark Dir. at 12-13.

would be $0.[5] Even College Station witness Mr. Dreyfus interprets that order to mean that $0 of College Station's requested amount for "Taxes Other Than Income Taxes" was allocated to the transmission function.[6] That order was the last time the Commission conducted a full review of College Station's transmission rates.

Although the Commission never authorized College Station to allocate any portion of its PILOT to the transmission function or recover those amounts in its wholesale transmission rates, College Station began allocating PILOT to the transmission function beginning in its 2007 interim TCOS proceeding.[7] This practice continued throughout its next two interim TCOS filings in 2008 and 2017.[8] In those interim filings, College Station modified the Commission-approved allocation percentage for its "Taxes Other Than Income Taxes," and that modification allowed College Station collect approximately $19.2 million through its wholesale transmission rates that was never authorized by a Commission rate order.[9] Staff witness Ms. Stark calculated carrying charges using the method specified in 16 TAC § 25.192(h)(2), which states that carrying charges on over-recoveries shall be calculated using the same rate of return that was applied to transmission investments included in the update. As of Ms. Stark's calculations in her testimony filed on June 23, 2022, the total amount of College Station's over-collections plus carrying charges was approximately $31.5 million.[10]

---

[5] *City of College Station Filing in Compliance with Subst. R. 23.67*, Docket No. 15762, Order at Order 15 attachment (July 8, 1997) ("College Station's tax expense for the transmission function is $0.").

[6] *See* Rebuttal Testimony of Mark K. Dreyfus (Dreyfus Reb.) at 17 ("I conclude that in adoption of the settlement, the Commission considered and approved a transfer of $1,434,060 in the Revenue Requirement and the allocation of that component of the Revenue Requirement to the transmission function was $0.").

[7] *Application of the City of College Station for Interim Update of Wholesale Transmission Rates Pursuant to Substantive Rule § 25.192(g)(1)*, Docket No. 34230, Direct Testimony of Timothy Crabb at 5-6 (May 1, 2007) ("Yes, the filing includes payments in lieu of taxes that are transfers by the Electric Department to the general revenues of the City of College Station...").

[8] *Application of the City of College Station for Interim Update of its Wholesale Transmission Rate Pursuant to PUC Subst. R. §25.192(g)(1)*, Docket No. 35837, Direct Testimony of Timothy Crabb at 6 (July 1, 2008); *Application of the City of College station for Interim Update of Wholesale Transmission Rates*, Docket No. 46847, Direct Testimony of Timothy Crabb at 6 (Feb. 10, 2017).

[9] Stark Dir. at 18.

[10] *Id.*

As the Commission explained in its Order Remanding Proceeding, under 16 TAC § 25.192, College Station was not authorized to recover the PILOT costs in any of its interim TCOS proceedings.[11] Interim TCOS filings are designed to be formulaic to allow a utility to quickly update its rates "to reflect changes in invested capital."[12] The interim TCOS mechanism does not, however, permit utilities to change or deviate from the rate structure that the Commission approved in the utility's last full rate review.[13] Doing so would be contrary to the intention of the rule and make the expedited TCOS updates ripe for abuse because the process involves strict time limitations that preclude a full review of each interim application.[14] Accordingly, the Commission determined that College Station's wholesale transmission rates updated in its interim TCOS proceedings violated 16 TAC § 25.192 and the Commission's order in College Station's last full TCOS case.[15]

Because College Station was never authorized to recover the PILOT charges, College Station should refund the over-collected $19.2 million, which amounts to approximately $31.5 million with carrying charges, so ratepayers do not ultimately bear the cost of College Station charging rates that were not authorized by the Commission. Specifically, TIEC supports Ms. Stark's initial recommendation that College Station return $31.5 million over a period of fifteen

---

[11] Order Remanding Proceeding at 2.

[12] *See* 16 Tex. Admin. Code § 25.192(h)(1) ("Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year *to reflect changes in its invested capital.*") (emphasis added); *see also Rulemaking Proceeding to Revise PUC Transmission Rules Consistent with the New ERCOT Market Design*, Project No. 23157 at 37 ("The purpose of §25.192(g)(1) is to specify *the basis for an interim update of transmission rates, which is change in invested capital.*") (May 31, 2001) (emphasis added).

[13] Contrary to College Station witness Mr. Dreyfus's claims, other utilities may have changed the amount of PILOT in their rates in an interim case, but the record in those cases demonstrates that those utilities simply applied their existing, Commission-approved PILOT allocation to the new invested capital being added in their interim rate update. However, none of those utilities sought to modify the percentage of their PILOT that was allocated to the transmission function, as College Station did here.

[14] 16 TAC § 25.192 (h)(4)(C) ("A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to §22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of §22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.").

[15] Order Remanding Proceeding at 2.

years with carrying charges on the over-collection at a rate equal to the rate of return that College Station is awarded in this proceeding.[16] That approach is consistent with the Commission's rules, which contemplate a **mandatory** true-up to make ratepayers whole by refunding any over-collected amounts with carrying cost equal to the TSP's authorized rate of return.[17] Further, fifteen years is a reasonable amount of time for College Station to return the amount because the over-collection occurred over a period of fifteen years.[18]

The Commission should not allow College Station to keep the amounts that it over-collected simply because the amount of refund is large compared to its total TCOS revenue requirement. Utilities should regularly file rate cases to ensure that interim TCOS updates remain just and reasonable. Nevertheless, College Station opted to forego a comprehensive rate case since 1997, and that led to it over-collecting on its transmission investment for many years. It was College Station's decision to forego a full rate review, and the risk of that decision should be borne by the utility rather than wholesale and retail ratepayers. Every one of the Commission's interim rate orders explicitly warned College Station that its updated transmission rates would be subject to reconciliation at its next complete rate review, and "*[a]ny over-recovery of costs, as a result of the [interim] update[s], is subject to refund.*"[19] As such, TIEC takes the position that the Commission should order College Station to refund the over-collected amount over 15 years with

---

[16]  Stark Dir. at 19.

[17]  16 TAC § 25.192 (h)(2) ("An update of transmission rates under paragraph (1) of this subsection *shall be subject to reconciliation* at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary.") (emphasis added); *see* Stark Dir. at 19.

[18]  Stark Dir. at 19.

[19]  Crabb Reb. at TRC-6 (Order in 2007 TCOS Case, Docket No. 34230) page 4, Ordering Para. 4 ("The updated rate is subject to reconciliation at the next complete review of College Station's TCOS. . . . *Any over-recovery of costs, as a result of the update, is subject to refund.*") (emphasis added); *id.* at 3, FoF 7 ("Staff recommended that [College Station's application] be approved as filed on May 1, 2007, *with the updated transmission rate and underlying facility additions being subject to a comprehensive analysis and reconciliation at the next complete review of COCS's transmission cost of service.*") (emphasis added); *see also id.* at TRC-10, page 4, Ordering Para. 4 (Order in Docket No. 35837) (same); *id.* at 9 FoF 11 (same); *see also id.* at 4, Ordering Para. 3 (Order in Docket No. 46847) (same); *id.* at 1-2 FoF 5 (same).

carrying cost equal to College Station's rate of return. While this over-collection is large, that is even more reason why College Station should not be allowed to retain the over-collected amounts.

## III.   CONCLUSION

TIEC reserves the right to participate in the hearing on the merits and post-hearing briefing, and to update its position based on any additional information presented at the hearing.

Respectfully submitted,

O'MELVENY & MYERS LLP

*/s/ Michael A. McMillin*
Katherine L. Coleman
State Bar No. 24059596
Michael A. McMillin
State Bar No. 24088034
John R. Hubbard
State Bar No. 24120909
303 Colorado St., Suite 2750
Austin, TX 78701
(737) 261-8600
kcoleman@omm.com
mmcmillin@omm.com
jhubbard@omm.com
OMMeservice@omm.com

**ATTORNEYS FOR TEXAS INDUSTRIAL ENERGY CONSUMERS**

## <u>CERTIFICATE OF SERVICE</u>

I, John R. Hubbard, Attorney for TIEC, hereby certify that a copy of this document was served on all parties of record in this proceeding on this 27th day of April, 2023 by electronic mail, facsimile, and/or First Class, U.S. Mail, Postage Prepaid.

*/s/ John R. Hubbard*
John R. Hubbard

# Appendix Tab 5

16 Tex. Admin. Code § 25.192

Texas Administrative Code
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 25. Substantive Rules Applicable to Electric Service Providers
        Subchapter I. Transmission and Distribution
          Division 1. Open-Access Comparable Transmission Service for Electric Utilities in the Electric Reliability Council of Texas

16 TAC § 25.192

§ 25.192. Transmission Rates for Export from ERCOT

Currentness

(a) Tariffs. Each transmission service provider (TSP) shall file a tariff for transmission service to establish its rates and other terms and conditions and shall apply its tariffs and rates on a non-discriminatory basis. The tariff shall apply to all distribution service providers (DSPs) and any entity scheduling the export of power from the Electric Reliability Council of Texas (ERCOT) region. The tariff shall not apply to any entity engaging in wholesale storage as described by §25.501(m) of this title (relating to Wholesale Market Design for the Electric Reliability Council of Texas) (storage entity).

(b) Charges for transmission service delivered within ERCOT. DSPs, excluding storage entities, shall incur transmission service charges pursuant to the tariffs of the TSP.

(1) A TSP's transmission rate shall be calculated as its commission-approved transmission cost of service divided by the average of ERCOT coincident peak demand for the months of June, July, August and September (4CP), excluding the portion of coincident peak demand attributable to wholesale storage load. A TSP's transmission rate shall remain in effect until the commission approves a new rate. The TSP's annual rate shall be converted to a monthly rate. The monthly transmission service charge to be paid by each DSP is the product of each TSP's monthly rate as specified in its tariff and the DSP's previous year's average of the 4CP demand that is coincident with the ERCOT 4CP.

(2) Payments for transmission services shall be consistent with commission orders, approved tariffs, and §25.202 of this title (relating to Commercial Terms for Transmission Service).

(c) Transmission cost of service. The transmission cost of service for each TSP shall be based on the expenses in Federal Energy Regulatory Commission (FERC) expense accounts 560-573 (or accounts with similar contents or amounts functionalized to the transmission function) plus the depreciation, federal income tax, and other associated taxes, and the commission-allowed rate of return based on FERC plant accounts 350-359 (or accounts with similar contents or amounts functionalized to the transmission function), less accumulated depreciation and accumulated deferred federal income taxes, as applicable.

(1) The following facilities are deemed to be transmission facilities:

(A) power lines, substations, reactive devices, and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network;

(B) substation facilities on the high side of the transformer, in a substation where power is transformed from a voltage higher than 60 kilovolts to a voltage lower than 60 kilovolts;

(C) the portion of the direct-current interconnections with areas outside of the ERCOT region (DC ties) that are owned by a TSP in the ERCOT region, including those portions of the DC tie that operate at a voltage lower than 60 kilovolts; and

(D) capacitors and other reactive devices that are operated at a voltage below 60 kilovolts, if they are located in a distribution substation, the load at the substation has a power factor in excess of 0.95 as measured or calculated at the distribution voltage level without the reactive devices, and the reactive devices are controlled by an operator or automatically switched in response to transmission voltage.

(E) As used in subparagraphs (A)-(D) of this paragraph, reactive devices do not include generating facilities.

(2) For municipally owned utilities, river authorities, and electric cooperatives, the commission may permit the use of the cash flow method or other reasonable alternative methods of determining the annual transmission revenue requirement, including the return element of the revenue requirement, consistent with the rate actions of the rate-setting authority for a municipally owned utility.

(3) For municipally owned utilities, river authorities, and electric cooperatives, the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP.

(4) A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to §25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

(A) The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

(B) The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

(C) The governing body of the taxing entity is not the governing body of the utility; and

(D) The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

(5) The commission may adopt rate-filing requirements that provide additional details concerning the costs that may be included in the transmission costs and how such costs should be reported in a proceeding to establish transmission rates.

(d) Billing units. No later than December 1 of each year, ERCOT shall determine and file with the commission the current year's average 4CP demand for each DSP, or the DSP's agent for transmission service billing purposes, as appropriate, excluding the portion of coincident peak demand attributable to wholesale storage load. This demand shall be used to bill transmission service for the next year. The ERCOT average 4CP demand shall be the sum of the coincident peak of all of the ERCOT DSPs, excluding the portion of coincident peak demand attributable to wholesale storage load, for the four intervals coincident with ERCOT system peak for the months of June, July, August, and September, divided by four. As used in this section, a DSP's average 4CP demand is determined from the total demand, coincident with the ERCOT 4CP, of all customers connected to a DSP, including load served at transmission voltage, but excluding the load of wholesale storage entities. The measurement of the coincident peak shall be in accordance with commission-approved ERCOT protocols.

(e) Transmission rates for exports from ERCOT. A transmission service charge for exports of power from ERCOT must be assessed to transmission service customers for transmission service within the boundaries of the ERCOT region, in accordance with this section and the ERCOT protocols.

(1) A transmission service customer must be assessed a transmission service charge for the use of the ERCOT transmission system in exporting power from ERCOT based on scheduled exports and the rates established under subsections (c) and (d) of this section. The intervals must consist of one hour.

(2) The hourly transmission rate for exports from ERCOT will be the TSP's annual rate established under subsections (c) and (d) of this section divided by 8760.

(3) The entity scheduling the export of power over a DC tie is solely responsible to the TSP for payment of transmission service charges under this subsection.

(4) Beginning with the January 2023 reporting month, ERCOT must file a public report with the commission stating the total amount of energy imported and the total amount of energy exported over each DC tie for the calendar month. The report must also include the total amount of energy exported from the ERCOT region during the reporting month and each of the preceding 11 calendar months, reported by scheduling entity. Each report must be filed within 45 days of the end of the reporting month.

(f) Transmission revenue. Revenue from the transmission of electric energy out of the ERCOT region over the DC ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

(g) Revision of transmission rates. Each TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services. Any request for a change in transmission rates shall comply with the filing requirements established by the commission under this section.

(h) Interim Update of Transmission rates.

(1) Frequency. Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to §25.193 pursuant to an order in Project Number 37909, Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF), that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

(2) Reconciliation. An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the TSP's rate of return authorized in that complete review.

(3) Future consideration of effect on TSP's financial risk and rate of return. For a TSP that has increased its rates pursuant to paragraph (1) of this subsection, the commission may, in setting rates in the next complete review of the TSP's transmission cost of service, expressly consider the effects of reduced regulatory lag resulting from the interim updates to the TSP's rates and the concomitant impact on the TSP's financial risk and rate of return.

(4) Commission processing of application. The commission shall process an application filed pursuant to paragraph (1) of this subsection in the following manner.

(A) Notice and intervention deadline. The applicant shall provide notice of its application to all parties in the applicant's last complete review of the applicant's transmission cost of service and all of the distribution service providers listed in the last docket in which the commission set the annual transmission service charges for the Electric Reliability Council of Texas. The intervention deadline shall be 21 days from the date service of notice is completed.

(B) Sufficiency of application. A motion to find an application materially deficient shall be filed no later than 21 days after an application is filed. The motion shall be served on the applicant by hand delivery, facsimile transmission,

or overnight courier delivery, or by e-mail if agreed to by the applicant or ordered by the presiding officer. The motion shall specify the nature of the deficiency and the relevant portions of the application, and cite the particular requirement with which the application is alleged not to comply. The applicant's response to a motion to find an application materially deficient shall be filed no later than five working days after such motion is received. If within ten working days after the deadline for filing a motion to find an application materially deficient, the presiding officer has not filed a written order concluding that material deficiencies exist in the application, the application is deemed sufficient.

(C) Review of application. A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to §22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of §22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.

(5) Filing Schedule. The commission may prescribe a schedule for providers of transmission services to file proceedings to revise the rates for such services.

(6) DSP's right to pass through changes in wholesale rates. A DSP may expeditiously pass through to its customers changes in wholesale transmission rates approved by the commission, pursuant to §25.193 of this title (relating to Distribution Service Provider Transmission Cost Recovery Factors (TCRF)).

(7) Reporting requirements. TSPs shall file reports that will permit the commission to monitor their transmission costs and revenues, in accordance with any filing requirements and schedules prescribed by the commission.

**Credits**
**Source:** The provisions of this §25.192 adopted to be effective April 13, 1999, 24 TexReg 2874; amended to be effective September 30, 1999, 24 TexReg 8162; amended to be effective December 29, 1999, 24 TexReg 11722; amended to be effective June 20, 2001, 26 TexReg 4440; amended to be effective August 25, 2010, 35 TexReg 7195; amended to be effective April 18, 2012, 37 TexReg 2613; amended to be effective July 5, 2016, 41 TexReg 4805; amended to be effective December 20, 2022, 47 TexReg 8267.

Current through 50 Tex.Reg. No. 5018, dated July 25, 2025, as effective on or before August 1, 2025. Some sections may be more current. See credits for details.

16 TAC § 25.192, 16 TX ADC § 25.192

# Appendix Tab 6

16 Tex. Admin. Code § 22.35

Texas Administrative Code
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 22. Procedural Rules
        Subchapter C. Classification of Applications or Other Documents Initiating a Proceeding

16 TAC § 22.35

§ 22.35. Informal Disposition

Currentness

(a) Applications qualified for informal disposition. An application, other than a major rate proceeding, may be approved by the commission without a hearing under the following conditions:

(1) at least 15 days have passed since the completion of all notice requirements;

(2) the decision is not adverse to any party other than the commission staff; and

(3) the commission finds that no hearing is necessary.

(b) Methods of disposition.

(1) Notice of approval. Upon delegation by the commission, certain uncontested applications may be approved by the presiding officer through a notice of approval without consideration by the commission at open meeting. The commission shall maintain a list of the types of applications eligible for disposition by notice of approval.

(2) Proposed order. For all other applications, the presiding officer shall prepare a proposed order which shall be served on all parties no less than 20 days before the commission is scheduled to consider the application in open meeting.

(c) Corrections and exceptions.

(1) Corrections to notice of approval. Parties may file suggested corrections to a notice of approval within 15 days of the issuance of such notice. Corrections may be made at the discretion of the presiding officer.

(2) Exceptions to proposed order. Parties may file exceptions or suggested corrections to the proposed order, no less than seven days before the commission is scheduled to consider the application in an open meeting.

(d) Rehearing. Nothing in this section shall be construed to alter a party's ability to request rehearing pursuant to § 22.264 of this title (relating to Rehearing).

(e) Notice requirements. Nothing in this section shall be construed to alter any notice requirement imposed on any proceeding by statute, rule, or order.

(f) Time limits. Nothing in this section shall be construed to alter any time limit imposed on any proceeding by a statute, rule, or order.

**Credits**
**Source:** The provisions of this § 22.35 adopted to be effective September 8, 1995, 20 TexReg 6627; amended to be effective July 22, 1998, 23 TexReg 7364; amended to be effective March 26, 2001, 26 TexReg 2351.

Current through 50 Tex.Reg. No. 5018, dated July 25, 2025, as effective on or before August 1, 2025. Some sections may be more current. See credits for details.

16 TAC § 22.35, 16 TX ADC § 22.35

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix Tab 7

16 Tex. Admin. Code § 22.5

Texas Administrative Code
  Title 16. Economic Regulation
    Part 2. Public Utility Commission of Texas
      Chapter 22. Procedural Rules
        Subchapter A. General Provisions and Definitions

16 TAC § 22.5

§ 22.5. Suspension of Rules and Commission-Prescribed Forms

Currentness

(a) Suspension. The commission may suspend the operation of one or more of the sections in this chapter if there exists a public emergency or imperative public necessity and the commission ascertains that suspension will best serve the public interest and will not prejudice the rights of any party.

(b) Good cause exception. Notwithstanding any other provision of this chapter, the presiding officer may grant exceptions to any requirement in this chapter or in a commission-prescribed form for good cause.

**Credits**
**Source:** The provisions of this § 22.5 adopted to be effective November 1, 1993, 18 TexReg 6641.

Current through 50 Tex.Reg. No. 5018, dated July 25, 2025, as effective on or before August 1, 2025. Some sections may be more current. See credits for details.

16 TAC § 22.5, 16 TX ADC § 22.5

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Laurent on behalf of Jordan Pratt
Bar No. 24140277
david.laurent@oag.texas.gov
Envelope ID: 105609254
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Response Brief of Appellee Public Utility Commission of Texas
Status as of 9/15/2025 4:49 PM CST

Associated Case Party: City of College Station

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Thomas LBrocato | | tbrocato@lglawfirm.com | 9/15/2025 4:10:18 PM | SENT |
| Roslyn M.Warner | | rwarner@lglawfirm.com | 9/15/2025 4:10:18 PM | SENT |
| Adam Falco | | afalco@cstx.gov | 9/15/2025 4:10:18 PM | SENT |

Associated Case Party: Public Utility Commission of Texas

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| John Hulme | 10258400 | John.Hulme@oag.texas.gov | 9/15/2025 4:10:18 PM | SENT |
| Jordan Pratt | 24140277 | jordan.pratt@oag.texas.gov | 9/15/2025 4:10:18 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 9/15/2025 4:10:18 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 9/15/2025 4:10:18 PM | SENT |
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 9/15/2025 4:10:18 PM | SENT |
| Benjamin Barkley | | benjamin.barkley@opuc.texas.gov | 9/15/2025 4:10:18 PM | SENT |
| OPUC  Eservice | | opuc_eservice@opuc.texas.gov | 9/15/2025 4:10:18 PM | SENT |